**Thomas McKEE, Petitioner-Appellant,**

v.

**David HARRIS, Superintendent, Green Haven Correctional Facility, Stormville, New York, Respondent-Appellee.**

**No. 475, Docket 80–2202.**

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1980.

Decided May 28, 1981.

Richard Harbus, New York City, for petitioner-appellant.

Tyrone Mark Powell, Asst. Atty. Gen., New York City (Robert Abrams, Atty. Gen., of N. Y., Gerald J. Ryan, Asst. Atty. Gen., New York City, of counsel), for respondent-appellee.

Before OAKES and MESKILL, Circuit Judges, and WERKER, District Judge.*

MESKILL, Circuit Judge:

Thomas McKee appeals from a judgment of the United States District Court for the Southern District of New York, Sweet, J., denying his petition for a writ of habeas corpus. In his petition to the district court, McKee raised a host of claims,[1] the most serious of which was that he had been denied his Sixth Amendment right to counsel. The petition was referred to Magistrate Kent Sinclair, who concluded that McKee's Sixth Amendment rights had been violated and recommended that the writ be grant-

---

* Honorable Henry F. Werker of the United States District Court for the Southern District of New York, sitting by designation.

1. In his petition to the district court, McKee claimed that:

> 1) he was denied a fair, trial because the court did not permit him to voice his reasons for his dissatisfaction with appointed counsel; 2) his discharge of appointed counsel did not constitute a waiver of counsel because he informed the court both that he had no confidence in his attorney and that he did not want to proceed pro se; 3) his "waiver" was not scrutinized by the court to determine its voluntariness; 4) he was denied a fair trial when the court refused to appoint new counsel after petitioner discharged Occhetti; 5) the court's reappointment of Occhetti to finish jury selection implicitly acknowledged petitioner's need for representation; 6) he was denied the right to effective counsel when a court officer refused to permit his legal advisor to approach petitioner while he was being cross-examined on the witness stand; 7) he was denied a fair trial by the government's cross-examination of petitioner on the subject of the persons with whom he was arrested on a federal conspiracy charge; 8) he was denied a fair trial by the court's refusal to repeat the portion of the charge on "sale" and "possession," and 9) he was wrongfully forced to waive his defenses of agency and entrapment.

485 F.Supp. at 868.

ed.[2]  Judge Sweet, after an extensive review of the record, declined to adopt the magistrate's recommendation and refused to grant the writ.[3]  The decision below is reported at 485 F.Supp. 866.  Shortly thereafter the district court granted McKee's application for a certificate of probable cause.  On this appeal, McKee raises only the Sixth Amendment claim.  For the reasons stated below, we affirm.

## BACKGROUND

McKee was arrested and indicted in the late summer of 1975 for possession and sale of a controlled substance.  Attorney Richard Occhetti of the New York Legal Aid Society was appointed to represent the defendant.  Occhetti, who had already represented McKee in a related case, began the process of impanelling a jury.  McKee, however, under circumstances set forth below, rejected Occhetti's assistance and, after failing to persuade the court to appoint new counsel, chose to represent himself with the assistance of a "legal advisor."  The defendant was convicted on May 5, 1976 and was subsequently sentenced to an indeterminate term of seven years to life imprisonment.  The Appellate Division unanimously affirmed, *People v. McKee*, 64 A.D.2d 873, 406 N.Y.S.2d 943 (1st Dep't 1978), and the Court of Appeals denied leave to appeal, *People v. McKee*, 46 N.Y.2d 842, 414 N.Y. S.2d 1035, 386 N.E.2d 1099 (1978).  Shortly after he began serving his sentence [4] McKee filed the habeas corpus petition which is the subject of this appeal.

On the morning of the second day of jury selection, a Friday, the following exchange took place between New York Supreme Court Justice Dorothy Cropper and McKee:

THE COURT: Mr. McKee, I understand you wish to make an application. Stand up and make it.

THE DEFENDANT: Your Honor, the attorney here already said when I first come in here, him and the District Attorney had already deliberating on my case, telling me that I am already guilty before I even get a trial, so if they say that to me, I don't need him, he can go and join the D.A.  I don't need him to defend me.  Just have him over there with him, because I don't need nobody like that.

\* \* \* \* \* \*

THE COURT: ... Mr. McKee, are you saying that you want to represent yourself?

\* \* \* \* \* \*

THE DEFENDANT: I am not a fool. No, I don't want to represent myself. I want a lawyer, but I don't want him.

\* \* \* \* \* \*

THE COURT: You mean you want the Court to assign you another lawyer?

THE DEFENDANT: Assign me another lawyer, but not this guy here.

\* \* \* \* \* \*

THE COURT: That application is denied.

McKee, however, would not acquiesce in the court's resolution of his request.  When Mr. Occhetti attempted to resume his representation of the defendant, McKee interrupted and the following heated colloquy ensued:

THE DEFENDANT: He is not representing me and I won't let him speak on my case.  He cannot speak on my case.  We will have no representation at all.

THE COURT: I have told you to be quiet and listen to what the Court has to tell you.  Now, kindly listen to the Court.' Now, you have an attorney.

2.  In so ruling, Magistrate Sinclair concluded McKee had exhausted his state remedies. Judge Sweet agreed, and the state has not challenged this finding.  Magistrate Sinclair found no merit in the non-Sixth Amendment claims raised in the petition.

3.  Judge Sweet did, however, adopt those portions of the magistrate's report involving the

other issues raised in the petition.  *See* note 2 *supra*.

4.  When McKee brought this habeas corpus petition, he was incarcerated at Green Haven Correctional Facility.  Although he was later transferred to Attica, the respondent's name has not been changed for this appeal.

THE DEFENDANT: I don't have one. I don't want him.

THE COURT: Then you have to retain your own attorney. The Court will not assign you an attorney.

THE DEFENDANT: Well, then, tell him he is relieved and I will get one.

THE COURT: Listen to me, please. The Court will permit you to represent yourself if you wish to do that.

THE DEFENDANT: I have to do that, then until I can get a lawyer. Now, I will just state on the record that I don't want to represent myself. I want an attorney. Please put that in the record.

THE COURT: Mr. McKee, do I understand that you don't want to represent yourself?

THE DEFENDANT: I do not want to represent myself, but I do not want this attorney, but if I have to represent myself, I will do it to the best of my ability. I am not afraid to do that.

THE COURT: Mr. McKee, you best listen carefully to what your choices are.

The court then explained that McKee could (1) continue with Occhetti as counsel, (2) represent himself, or (3) retain a private attorney. As to the first option, McKee reiterated, "I am not going to let this man represent me when he done stated plain as day that I am guilty already [and] that my chances are slim . . . ." As to the second and third choices, McKee repeated that he did not want to represent himself and could not afford to hire his own lawyer. Finally, after some further acerbic exchanges,[5] McKee agreed to represent himself with the help of a "legal advisor."[6] Elmer Ferber, an Appellate Division lawyer who happened to be in the courthouse, was assigned to sit at counsel table and assist McKee. At the request of the defendant, the court inquired whether Mr. Ferber would be able to pro-

ceed as defense counsel by Monday but, upon receiving a negative response, directed that the trial proceed. The court instructed Mr. Occhetti, who had been banished from the counsel table to the rear of the courtroom, to remain available to assist Mr. Ferber, if requested. Occhetti was subsequently recalled from exile to complete the jury selection, after which time he returned to the rear of the courtroom. After a brief trial at the beginning of the following week, McKee was convicted.

## DISCUSSION

◼ In seeking this writ of habeas corpus, McKee contends that his Sixth Amendment right to assistance of counsel was denied because he did not effectively waive the assistance of a lawyer. To be effective, a waiver must be knowing, intelligent and voluntary—a choice "made with eyes open." *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279, 63 S.Ct. 236, 242, 87 L.Ed. 268 (1942). *See Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); *Johnson v. Zerbst*, 304 U.S. 458, 464–65, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *United States v. Tompkins*, 623 F.2d 824, 827 (2d Cir. 1980). At oral argument, counsel for McKee conceded that the waiver in this case was knowing and intelligent, since McKee relinquished his right to court-appointed counsel with full understanding of the penalties he faced and the pitfalls of self-representation. The issue on this appeal, therefore, is whether McKee's waiver can be said to be voluntary in light of the events which took place on the second day of jury selection.

◼ McKee contends that in electing to represent himself with the help of a legal advisor he was "given no freedom of choice," but rather was "bowing to the inevitable." Appellant's Br. at 15–16 (quot-

---

5. The atmosphere in the court became so hostile that at one point the court made arrangements to have the defendant removed. At least ten times in the colloquy, the court had to ask the defendant not to interrupt and to listen when the court was trying to speak.

6. In *United States v. Spencer*, 439 F.2d 1047 (2d Cir. 1971), this Court recommended that district courts "offer as an alternative to an indigent defendant who wishes to proceed *pro se* the assistance of appointed counsel to the extent that the defendant may wish to make use of his services." *Id.* at 1051.

ing *United States ex rel. Martinez v. Thomas*, 526 F.2d 750, 755–56 (2d Cir. 1975)). Of course, the very essence of a voluntary waiver is that it be the product of a free and meaningful choice. *Moore v. Michigan*, 355 U.S. 155, 164, 78 S.Ct. 191, 196, 2 L.Ed.2d 167 (1957); *Wilks v. Israel*, 627 F.2d 32, 35 (7th Cir. 1980); *Maynard v. Meachum*, 545 F.2d 273, 278 (1st Cir. 1976). This does not mean, however, that a court may not, under certain circumstances, require the defendant to select from a limited set of options a course of conduct regarding his representation. "A criminal defendant may be asked, in the interest of orderly procedures, to choose between waiver and another course of action as long as the choice presented to him is not constitutionally offensive." *Maynard v. Meachum, supra*, 545 F.2d at 278. *See also Wilks v. Israel, supra*, 627 F.2d at 35; *United States v. Davis*, 604 F.2d 474, 483 (7th Cir. 1979); *United States ex rel. Testamark v. Vincent*, 496 F.2d 641, 643–44 (2d Cir. 1974), *cert. denied*, 421 U.S. 951, 95 S.Ct. 1685, 44 L.Ed.2d 105 (1975); *United States v. Morrissey*, 461 F.2d 666, 670 (2d Cir. 1972). "That petitioner did not particularly like the choice presented to him and that he did not want to proceed *pro se* are not sufficient reasons to render the choice constitutionally offensive." *Wilks v. Israel, supra*, 627 F.2d at 36. The question, therefore, is whether Justice Cropper's refusal to assign new counsel—which in turn forced the defendant to select from among the unwanted options—placed McKee in a "dilemma of constitutional magnitude," *Maynard v. Meachum, supra*, 545 F.2d at 278, that would justify granting the requested writ.

It is settled in this Circuit that "[o]nce trial has begun ... a defendant does not have the unbridled right to reject assigned counsel and demand another." *United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). This Court has long recognized that certain restraints must be put on the reassignment of counsel lest the right be "manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir.), *cert. denied*, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). Therefore, "[i]n order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication or an irreconcilable conflict which leads to an apparently unjust verdict." *United States v. Calabro, supra*, 467 F.2d at 986. *See Maynard v. Meachum, supra*, 545 F.2d at 278; *United States v. Gutterman*, 147 F.2d 540, 542 (2d Cir. 1945). *See also* R. Chused, *Faretta and the Personal Defense: The Role of a Represented Defendant in Trial Tactics*, 65 Calif. L.Rev. 636, 645–46 (1977). The question therefore boils down to whether McKee demonstrated good cause for the substitution of assigned counsel.

The grounds that McKee raised for substitution of counsel were that Occhetti had "prejudged" him and informed him that his chances of acquittal were slim. In addition, McKee suggests that Occhetti actually discussed with the prosecutor the fact of McKee's guilt.[7] McKee argues that, re-

---

**7.** At one point in the colloquy, McKee stated that Occhetti had "already said when I first come in here, him and the District Attorney had already deliberating on my case, telling me that I am already guilty ...." The prosecutor immediately and vigorously denied any suggestion that he and Occhetti had in any way collaborated on McKee's case, and the defendant did not again make the accusation. In his petition to the district court, McKee alleged, in pertinent part, that "[t]he appellant did inform the court, that he was a layman and ask the court to appoint new counsel because he had no confident [*sic*] in the court appointed coun-

sel, Mr. Occhetti, and that he did not want to proceed pro-se." McKee did not mention any alleged collusion as a reason for substitution. In interpreting McKee's Sixth Amendment claim, the district court stated, "[McKee's] petition indicates that the real reason for making the request [for new counsel] was that he lacked confidence in his attorney" because "Occhetti told defendant that he believed McKee was guilty and that his chances of success were slim." 485 F.Supp. at 869. McKee has not challenged this characterization of his grievance. Indeed, in his brief to this Court, McKee states, "[T]he important point is not

gardless of whether these allegations are true, the resulting loss of trust wrought a "fundamental disruption of the integrity of the attorney-client relationship." Appellant's Br. at 8. Thus, the argument goes, there was a "complete breakdown in communication" which warranted the eleventh-hour substitution, despite the potential for delay and disruption of the ongoing trial. We find these contentions to be meritless.

■ In the first place, we cannot agree with the appellant's suggestion that good cause is to be determined solely according to the subjective standard of what the defendant perceives. While loss of trust is certainly a factor in assessing good cause, a defendant seeking substitution of assigned counsel must nevertheless afford the court with legitimate reasons for the lack of confidence. *See United States v. Hart*, 557 F.2d 162, 163 (8th Cir.) (per curiam), *cert. denied*, 434 U.S. 906, 98 S.Ct. 305, 54 L.Ed.2d 193 (1977); *United States ex rel. Martinez v. Thomas, supra*, 526 F.2d at 755; *United States v. Young*, 482 F.2d 993, 996 (5th Cir. 1973); *United States v. Calabro, supra*, 467 F.2d at 986. Indeed, a purely subjective standard would convert the requirement of good cause into an empty formality, since the defendant would be entitled to demand a reassignment of counsel simply on the basis of a "breakdown in communication" which he himself induced. As the district court stated, "It is true that the request for new counsel put a strain on the attorney-client relationship .... However, to find that this alone amounts to a breakdown in communication that justifies appointment of new counsel after the commencement of a trial grants ... unrestrained power to the defendant to discontinue the trial." 485 F.Supp. at 869 n.1. We decline to endorse such an interpretation of good cause.

■ McKee's asserted reason for his loss of trust—that counsel had prejudged him and provided a pessimistic forecast—does not rise to the level of good cause for substitution of counsel. As the district court stated, "The mere fact that appointed counsel makes such statements simply cannot constitute 'good cause' for requesting new counsel. If the rule were otherwise, appointed counsel could be replaced for doing little more than giving their clients honest advice." 485 F.Supp. at 869. The starting point for effective representation is a realistic assessment of the prospects of success in light of the risks of failure. It is precisely this balancing process which leads many defense lawyers to advise their clients to enter plea negotiations. As Judge (now Chief Justice) Burger has stated:

> A lawyer has a duty to give the accused an honest appraisal of his case. This is commanded in part because without it the accused cannot make an informed judgment as to whether he should enter a plea of guilty—a course of action frequently to the advantage of an accused. The constitutional right to counsel does not mean counsel who will be optimistic in his private appraisal of the evidence and his advice to the accused. Counsel has a duty to be candid; he has no duty to be optimistic when the facts do not warrant optimism.

*Brown v. United States*, 264 F.2d 363, 369 (D.C.Cir.) (in banc), *cert. denied*, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959) (Burger, J., concurring). Moreover, that a criminal defendant views this sort of frank advice as prejudgment of guilt does not thereby convert good representation into good cause. For example, in *United States v. Gutterman, supra*, the defendant sought new counsel because his assigned attorney would not subpoena certain witnesses and

---

whether Occhetti actually said anything [to the prosecutor], but the fact that McKee sincerely felt that his own counsel openly spoke of him as guilty." Appellant's Br. at 6. Under these circumstances, we do not read McKee's appeal as raising an independent allegation that Occhetti was in fact in collusion with the prosecution. *Compare Pizarro v. Harris*, 507 F.Supp.

642, 645 (S.D.N.Y.1981) (defendant's unsubstantiated allegation that the prosecutor was "imposing his will on the defense" is not a ground for substitution of counsel) *with United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973) (disclosure of confidential defense matters to the prosecution would ordinarily constitute good cause for substitution).

had recommended that the defendant plead guilty. As to the latter point, the defendant advised this Court in now-familiar language, "Mr. Packer [the defense attorney] last night told me that he thought the Government had too much evidence against me, he was going to advise me to plead guilty. If I am going to plead guilty, I might as well defend myself." 147 F.2d at 541 n.1. The Court rejected both reasons for reassignment of counsel, stating that an indigent defendant "must accept such counsel as the court assigns unless he can furnish a better reason for requiring a change than he has given here . . . ." *Id.* at 542. *See also Brown v. United States, supra,* 264 F.2d at 366 ("The fact that [the defendant's] counsel 'didn't think he had a chance of beating the thing' is not . . . a reason" for substitution of appointed counsel.). Under these circumstances, we do not think that McKee's dissatisfaction with his counsel constituted good cause for assignment of a new attorney.

■ Finally, McKee argues that the failure of Justice Cropper to inquire into the reasons for his dissatisfaction constituted reversible error. It is settled that where a defendant voices a "seemingly substantial complaint about counsel," the court should inquire into the reasons for dissatisfaction. *United States v. Calabro, supra,* 467 F.2d at 986. *See United States ex rel. Martinez v. Thomas, supra,* 526 F.2d at 756; *United States v. Morrissey, supra,* 461 F.2d at 669–70; *United States v. Young, supra,* 482 F.2d at 995; *Brown v. Craven,* 424 F.2d 1166, 1169 (9th Cir. 1970); W. Schwarzer, *Dealing With Incompetent Counsel—The Trial Judge's Role,* 93 Harv.L.Rev. 633, 652 (1980); R. Chused, *Faretta and the Personal Defense: The Role of a Represented Defendant in Trial Tactics,* 65 Calif.L.Rev. 636, 646–48 & nn. 41, 43 (1977). In responding to this argument, Judge Sweet stated, "While it would have been preferable for the trial judge to have formally inquired into the reasons for the petitioner's request, she was not completely unjustified in believing that he had already stated them. The record reflects that petitioner had no difficulty making his views known, at times

to the exclusion of adhering to the court's directions." 485 F.Supp. at 869 (footnote omitted).

■ We agree that, while Justice Cropper should have conducted a formal inquiry, the failure to do so in this case was harmless. McKee repeatedly volunteered that he had lost confidence in Occhetti because Occhetti had prejudged him and offered a bleak legal prognosis. Neither in his petition below nor in his brief or argument on appeal has McKee suggested any other reason that would have been elicited by a formal inquiry. Where the failure to inquire causes the defendant no harm, that procedural irregularity cannot of itself be a basis for granting the writ. *See United States v. Morrissey, supra,* 461 F.2d at 670 (where reasons for substitution of counsel were either cured or were insubstantial, failure to inquire is harmless error); *United States v. Young, supra,* 482 F.2d at 995–96 (where proffered reasons for substitution were insubstantial and defendant received able representation, failure to inquire is harmless). In *Brown v. United States, supra,* the court explicitly held that a trial judge's failure to inquire where the reasons have already been given is not reversible error:

> [A]lthough [the defendant's] assigned counsel had told the court his client wanted him replaced because of his pessimism as to the result, appellant contends here that the judge committed reversible error by not consulting him personally as to the cause of his dissatisfaction with his lawyer. But he does not say there was any cause other than that stated by the attorney or that, had he personally been asked, he would have given a different reason.
>
> *       *       *       *       *       *
>
> We cannot suppose that, had he been asked, appellant would have given a different reason for being displeased with his attorney, when he does not suggest there was a different reason which he would have given. Nor can we reverse and remand for a new trial merely to give the appellant the satisfaction of be-

ing personally asked why he wanted to dismiss his counsel and have another appointed when, as far as we know or have been informed, he would give no reason except that given by his attorney.

264 F.2d at 366. In summarizing the areas of agreement between the majority and dissenting opinions [8] Judge Burger stated what we feel is a sensible rule:

> [W]hen, for the first time, an accused makes known to the court in some way that he has a complaint about his counsel, the court must rule on the matter. If the reasons are made known to the court, the court may rule without more. If no reasons are stated, the court then has a duty to inquire into the basis for the client's objection to counsel and should withhold a ruling until reasons are made known.

*Id.* at 369 (Burger, J., concurring). In this case, McKee's reasons were plainly stated and even now, five years after the alleged deprivation, no different reasons are offered. Under these circumstances, we do not think it unreasonable "at least to require that the defendant must show his hand." *United States v. Mitchell*, 137 F.2d 1006, 1010 (2d Cir.), *cert. denied*, 321 U.S. 794, 64 S.Ct. 785, 88 L.Ed. 1083 (1945). Judge Sweet correctly refused to grant the writ on this basis.

## CONCLUSION

Since good cause did not exist for assignment of new counsel, Justice Cropper's presentation of options to McKee did not render the latter's choice involuntary. The failure to inquire into the reasons for McKee's dissatisfaction, although improper, was harmless error. Inasmuch as McKee's waiver of his right to counsel was knowing, intelligent, and voluntary, Judge Sweet did not err in refusing to grant the writ.

Affirmed.

8. The *in banc* court in *Brown* was divided four to four, with Judge Burger having the swing vote. In a recent opinion, Judge Bazelon, one of the dissenters in *Brown*, recognized that Judge Burger's concurring opinion "summa-

OAKES, Circuit Judge (dissenting):

I dissent.

The majority and I do not, I think, disagree on the law governing the Sixth Amendment right to effective assistance of counsel. I assume that the majority would agree with me that the Second Circuit has had a long and distinguished history of protecting that right and of ensuring that a waiver of it by the defendant may be made only in a knowing, intelligent, and voluntary manner. Indeed, it is now held that "waivers of Sixth Amendment rights must be measured by a 'higher standard' than are waivers of Fifth Amendment rights." *United States v. Mohabir*, 624 F.2d 1140, 1146 (2d Cir. 1980); *see United States v. Satterfield*, 558 F.2d 655 (2d Cir. 1976). And I know the majority agrees with me, because it quotes the case, that the law of this Circuit is that

> [i]n order to warrant a substitution of counsel during trial, the defendant must show good cause, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict.... If a court refuses to inquire into a seemingly substantial complaint about counsel when he has no reason to suspect the bona fides of the defendant, or if on discovering justifiable dissatisfaction a court refuses to replace the attorney, the defendant may then properly claim denial of his Sixth Amendment right.

*United States v. Calabro*, 467 F.2d 973, 986 (2d Cir. 1972) (citations omitted), *cert. denied*, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973). Where I differ, then, with the majority is in applying the Second Circuit law to the facts of this case, a case in which there appears to have been a fundamental disruption of the attorney-client relationship resulting in the defendant's total loss of confidence in his assigned counsel and a complete breakdown in communication

rized the grounds of common agreement between the majority and dissenting opinions." *United States v. Decoster*, 624 F.2d 196, 270 (D.C.Cir.1976) (*in banc*) (Bazelon, J., dissenting).

which was simply not inquired into by the state court trial judge.

First, to avoid confusion, I list what is *not* involved in this case. This is not a case of an attorney-client dispute arising after a trial was already well under way. The dispute occurred early on the morning of the second day of trial; the jury was in the process of being drawn and, of course, no witnesses had been called. Moreover, this case did not involve merely a disagreement over trial strategy; the disagreement went to the core of the attorney-client relationship. And this is not a case like *Brown v. United States*, 264 F.2d 363, 366–67 (D.C. Cir.) (en banc), *cert. denied*, 360 U.S. 911, 79 S.Ct. 1299, 3 L.Ed.2d 1262 (1959), heavily relied upon by the majority, in which the lawyers simply advised the accused that the chances of acquittal were not great. The record here does not indicate—although if the trial judge had inquired, it conceivably could have indicated—that this was, to use the majority's words, only a matter of a client's construing "frank advice as prejudgment of guilt." Rather, this is a case in which, as McKee put it to the trial court,

> [Mr. Occhetti] and the District Attorney had already deliberating [*sic*] on my case, telling me that I am already guilty before I even get a trial, so if they say that to me, I don't need him, he can go and join the D.A.

Shortly thereafter McKee elaborated:

> I am going to respect the law as long as the law respects me, but when you tell me that I should let this man represent me when he already done stated as plain as day that he cannot defend me properly, and you are going to tell me I should stand here and let him represent me, no, ma'am, I am not going to let him represent me and he already said that I am guilty. How does he know I am guilty? Was he there when the crime took place? ... Do you realize that I am facing fifteen years to life and I am not going to let this man represent me when he done stated plain as day that I am guilty al-

ready[,] that my chances are slim and all the rest? No, ma'am.

The majority states that "McKee's asserted reason for his loss of trust—that counsel had prejudged him and provided a pessimistic forecast—does not rise to the level of good cause for substitution of counsel." But I had thought that it was the *court's* function (with the help of the jury in this case) to determine guilt or innocence and that the defense lawyer's function was, rather, "to serve as the accused's counselor and advocate, with courage, devotion and to the utmost of his learning and ability, and according to law." *ABA Standards Relating to The Prosecution Function and The Defense Function* § 1.1(b), at 153 (Approved Draft 1971). To be sure, counsel has a duty to advise his client with complete candor, which includes giving his estimate of the probable outcome, *id,* § 5.1(a), at 162, but "[i]t is unprofessional conduct for a lawyer intentionally to understate or overstate the risks, hazards or prospects of the case to exert undue influence on the accused's decision as to his plea," *id.* § 5.1(b). In short, it is one thing for counsel to advise a defendant to plead guilty because his chances are slim. Were that simply the case here, the reasoning of *Brown* would be compelling and I would agree with the majority decision. *See also United States v. Gutterman*, 147 F.2d 540 (2d Cir. 1945). But as I believe the above quotations from the record demonstrate, McKee asserted that he had totally lost confidence in attorney Occhetti not only because the latter had prejudged McKee's case, but also because he had indicated to McKee both that McKee was guilty and his chances were slim, and that he, Occhetti, could not "defend [McKee] properly." None of this was denied by Occhetti himself. None of this was inquired into by the court. Thus the possibility that McKee had misinterpreted Occhetti's comments, a possibility which the majority seems to adopt as a finding, was never explored.

On this naked record—naked because of the trial judge's failure to inquire—it ap-

pears that what was involved was not the "realistic assessment of the prospects of success in light of the risks of failure" to which the majority addresses itself, but rather was the kind of "breakdown in communication" referred to in *Calabro,* 467 F.2d at 986, as good cause for substitution of counsel. As the Ninth Circuit has stated, "to compel one charged with grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." *Brown v. Craven,* 424 F.2d 1166, 1170 (9th Cir. 1970). Occhetti's actions and statements may well have so damaged his relationship with McKee that Occhetti would have been unable effectively to communicate with McKee and unable to conduct an adequate defense on his behalf. If this were indeed the case, then McKee had a Sixth Amendment right to a substitution of counsel. However, the trial judge had no way of knowing whether good cause for substitution of counsel existed, because she did not inquire into the reasons for McKee's dissatisfaction with Occhetti.

Although McKee finally decided to represent himself—and there is no question but that he did this knowingly and intelligently, for he was well aware of the consequences—it cannot be said that he made this decision "voluntarily." *See United States ex rel. Martinez v. Thomas,* 526 F.2d 750, 755–56 (2d Cir. 1975) (defendant who represented himself "reluctantly, unwillingly and greatly to his detriment," had "no freedom of choice," and was merely "bowing to the inevitable" was denied his constitutional rights); *Calabro,* 467 F.2d at 985 ("it is important that the court consider whether the defendant affirmatively made a choice or whether he proceeded alone only because he felt 'he had no choice' and thus did not effectively waive his right"). McKee said in the present record:

> Now, I will just state on the record that I don't want to represent myself. I want an attorney. . . . I do not want to rep-

resent myself, but I do not want this attorney [Occhetti], but if I have to represent myself, I will do it to the best of my ability.

As McKee argues on appeal, his per se representation at trial was the absolute antithesis of the voluntary waiver of counsel required by law.

What makes this case in a sense ironic is that, if the trial judge had made the necessary inquiry and had found good cause, then with a delay of only a few days, other counsel unquestionably could have been secured. Mr. Ferber, an attorney who happened to be in the courtroom and who did in fact serve as advisor, could have been given a little more time than the weekend to prepare the case and to familiarize himself with possible defenses. I am reminded of my dissent in *United States ex rel. Martinez v. Mancusi,* 455 F.2d 705, 709 (2d Cir.) *cert. denied,* 409 U.S. 959, 93 S.Ct. 273, 34 L.Ed.2d 228 (1972), in which I stated that "the right to counsel under the sixth and fourteenth amendments means the right to counsel that has had opportunity to prepare." But here McKee was rushed into defending himself after an apparent breakdown in communication with assigned counsel in a serious felony trial, before even the drawing of the jury had been completed. The trial judge's refusal to inquire into whether good cause for a substitution of counsel existed was, in my view, a violation of McKee's Sixth Amendment rights under our established case law.