# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2017-KA-01130-SCT

***TERRY L. HILL a/k/a MS FLY a/k/a TERRY HILL
a/k/a TERRY LAMONT HILL***

***v.***

***STATE OF MISSISSIPPI***

| | |
|---|---|
| DATE OF JUDGMENT: | 08/03/2017 |
| TRIAL JUDGE: | HON. LEE SORRELS COLEMAN |
| TRIAL COURT ATTORNEYS: | SCOTT WINSTON COLOM |
| | STEPHANIE L. MALLETTE |
| COURT FROM WHICH APPEALED: | OKTIBBEHA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC DEFENDER |
| | BY: MOLLIE MARIE McMILLIN |
| | GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: KATY TAYLOR GERBER |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/23/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND ISHEE, JJ.**

**KING, JUSTICE, FOR THE COURT:**

¶1.     Terry L. Hill was convicted in the Oktibbeha County Circuit Court of one count of robbery, two counts of kidnapping, and one count of sexual battery. Aggrieved, Hill raises one issue on appeal: whether the trial court erred in denying his attorney's motion to withdraw and Hill's motions for new counsel. Because of the defendant's actions prior to and at trial, and because of the substantial evidence against Hill, we affirm the decision of the

trial court.

## FACTS

¶2.     In the early morning hours of May 1, 2016, two men entered the house of Mississippi State University student Carly Stovall[1] in Starkville. The men sexually assaulted Carly and robbed Stephen,[2] her boyfriend at the time, of his iPhone. Law enforcement officers arrived on the scene while the two men were present. Corporal Christopher Jackson, an officer with the Starkville Police Department, testified that he received a call that a sexual assault was occurring. He proceeded to the area with Sergeant George Coleman. Corporal Jackson observed someone peeking through the windows of the house. He walked to the front door, and a man opened the door. Corporal Jackson identified the man as Hill. Hill greeted the officer and stated that he was a neighbor and that he was the one who had called 911. Corporal Jackson ordered Hill to put his hands up. Sergeant Coleman then entered the house and identified as Hill the man to whom he had observed Corporal Jackson speaking.[3] Shortly afterward, Stephen appeared in the doorway and said, "get him." Carly then appeared and started screaming, "that's the guy who raped me."

¶3.     Hill ran out the door, and the officers chased him. In the meantime, Stephen and Carly went to the hospital. There, Stephen informed the policemen that he did not have his iPhone. Stephen used a police officer's phone to log into the "Find my iPhone" application, a GPS

---

[1]A pseudonym has been used throughout this opinion.

[2]A pseudonym has been used throughout this opinion.

[3]Sergeant Coleman was wearing a body camera which captured the unfolding events.

tracking system, which enabled the police officers to track the phone. Officer Andrew Jenkins, a patrol officer with the Starkville Police Department, stated that on Sunday, May 1, 2016, law enforcement officers tracked Hill using Stephen's iPhone and informed him that Hill was on the MSU campus. Officer Jenkins went to the indicated area. While searching, a sergeant with the MSU police department noticed an open door that led to a crawl space under a house and wet footprints just inside the door. The sergeant called for a K-9 unit. At approximately 6:40 a.m., Officer Jenkins followed the K-9 unit under the house and found Hill in the left corner.[4] Stephen's iPhone was found on Hill's person.

¶4.     The Oktibbeha County Hospital staff performed a rape kit on Carly. Kathryn Rogers, a forensic deoxyribonucleic acid (DNA) analyst with Scales Biological Laboratory, testified that the vulvar swabs contained a mixed DNA profile consisting of at least two individuals and included sperm cells. Hill could not be excluded as a contributor; however, 99.99 percent of the general world population would be excluded from the mixture. The vaginal swabs contained a DNA profile from one major contributor which matched Hill's buccal swabs. Rogers testified that particular frequency is less than one in 999 trillion. In summary, Hill could not be excluded as a contributor to the sperm cells on the vulvar swab and he was a match to the major contributor of the mixture found in the sperm fraction of the vaginal swabs.

## PROCEDURAL HISTORY

¶5.     The trial court appointed public defender Stephanie Mallette to represent Hill. Hill

---

[4]Officer Jenkins's body camera also captured the events leading to Hill's arrest.

was indicted on six counts: Count I, Robbery; Count II, Kidnapping; Count III, Kidnapping; Count IV, Aggravated Assault; Count V, Sexual Battery; and Count VI, Rape. Hill pleaded not guilty to all counts.

¶6.     On July 27, 2016, Mallette filed a Motion to Withdraw, stating that Hill had advised her that he was not indigent and that he no longer desired Mallette to represent him. On January 5, 2017, at a hearing on the matter, Hill requested that the court appoint a different attorney to represent him, stating:

> Because me and my counselor are not compromised in our – my – in this case.
> We can't agree on anything. I have filed many letters. I never get a response,
> and I just feel as though she's not qualified for this case.

The trial court responded that it would not grant the appointment of a new attorney but instructed Mallette to respond to any letters that she received in the future. Mallette stated that she had responded to every letter that Hill had written to her with the exception of the most recent one, because she had received the letter during the Christmas break.

¶7.     On January 17, 2017, Hill filed a "Motion for Appointment of New Counsel." Hill stated that Mallette had failed to investigate properly "numerous" avenues of exculpatory evidence and mitigating facts, including street video surveillance, police body-camera footage, cellphone data from the victim's phone, illegal drug and alcohol usage by the victims, and evidence that the police knew of high drug usage around the Bin 612 in Starkville. Hill alleged that Mallette's representation fell well below the standard of competent counsel.

¶8.     Hill's trial was scheduled for July 24, 2017; however, the State did not elect to call

4

Hill's case for trial on that date. Hill's codefendant Jerry Talley's trial had been scheduled for July 31, 2017. Subsequent to that time, counsel for Talley had been allowed to withdraw from the case, rendering Talley's trial impossible on July 31. The district attorney then called Mallette and informed her that the State was ready to proceed against Hill on July 31. Mallette indicated that she was prepared for trial.

¶9. On July 27, 2017, at a hearing before the trial court, Mallette stated that Hill again had demanded that the court appoint him a different attorney. The trial court requested that Hill address the court from the podium. Hill declined and then stated, "It's not a problem. We [are] just having issues and I feel as though she's going to represent me. I want her to be my attorney." The trial court then directly asked Hill if he wanted Mallette to be his attorney, and Hill responded that he did. The trial court asked Mallette if she was prepared to begin trial, and Mallette again represented that she was prepared for trial at that point.

¶10. On July 31, 2017, the State called Hill's case for trial. Mallette requested a continuance, arguing that Hill had identified Talley in exchange for the State's consideration of Hill's cooperation. Mallette contended that the State did not give Hill's cooperation any consideration and that the State had changed its agreement to try Talley before Hill. It was undisputed that the State and the defense never had any written agreement. The State responded that no promises had been made to Hill and that the State had considered the fact that Hill had identified Talley but balanced that consideration with the allegations against Hill. The State then decided that Hill did not deserve much consideration. The State also argued that Hill had destroyed his own chances of cooperating with the State when Hill stated

under oath that he had no involvement in the case. The State alleged that Hill had made himself an unreliable and useless witness by under oath denying any involvement in the incident. Therefore, the State decided that, because of Hill's habitual-offender status, any plea offer the State would be prepared to make would involve more time served than his counsel reasonably could recommend that Hill accept.

¶11. Mallette responded that the State now had made her a witness in the case because the State had alleged that no promise had been made to Hill that he would receive consideration by the Starkville Police Department. Mallette alleged that the State's contention was not true and that she had been a party to the conversation in which Hill was promised consideration if he cooperated. The trial court denied Mallette's motion for continuance, reasoning that Mallette had announced on two separate occasions that she was prepared for trial; the trial court found, therefore, trial at that point to have resulted in no prejudice to Hill. In addition, the trial court stated that it had no authority to force the State to try Talley's case first. Mallette then requested that the trial court allow her to withdraw because she was a possible witness in the case. Mallette argued that, if the State was going to deny that a promise had been made to Mallette, then Hill would receive consideration for his cooperation in Talley's case, and she would be a definite and necessary witness. The State responded that it would not bring into evidence the fact that Hill had identified Talley. The trial court denied the motion to withdraw.

¶12. The State chose not to proceed on the rape and aggravated assault counts and moved to amend the indictment to proceed on one count of robbery, two counts of kidnapping, and

6

one count of sexual battery. The trial court granted the motion.

¶13.    The case proceeded to *voir dire*. After the conclusion of *voir dire*, but before jury selection, Hill advised his attorney that he would prefer to represent himself. Mallette advised Hill that she should do jury selection and that he could represent himself after that process. Hill represented that a conflict of interest existed between him and Mallette. He stated that he did not wish to proceed any further with Mallette on the case. The trial court inquired about the conflict of interest, to which Hill responded:

> Well, my attorney, she has – we – we can't agree on anything and all we do is fuss – I mean, fuss back and forth. Been doing this since the beginning, since she's been on my case. I have filed a motion back in January. I don't know if you're aware of this about --.

The trial court then asked Hill if, just the previous week, he had stated that he would like Mallette to represent him. Hill responded that he had answered in the affirmative under pressure, and that he had been threatened.

¶14.    Hill asked the trial court for a continuance until he could find competent counsel willing to represent him. Hill represented that his family had "a resource that they can get in touch with." Hill then stated:

> Well, your Honor, what I wanted to say was, it's a lot of things that hasn't taken place in this case and I don't – I don't know the reason why. You know, I have wrote Stephanie Mallette personally. I have asked for certain witnesses in this case that are not – as potential witness in this case that have some involvement in this case and they are not listed and I don't understand why – why – why is that so. I feel like this is – my life is on the line and I have just as much right as the victim to defend that.

The trial court read Uniform Rule of Circuit and County Court Practice 8.05, regarding *pro*

7

*se* defendants, to Hill.[5] Hill stated:

> But, your Honor, may I say I understand that – I feel like my attorney has misled this whole process because she wrote me in writing saying that she – she was going to withdraw from my case and I come way up here and talked with her. I did not come in front of the judge at a hearing to clarify that she was going to continue to be my attorney. I've been having problems with this counsel since the beginning and I want – I'm asking, can you please appoint me someone else?

The State responded, stating that while Mallette vigorously had represented Hill thus far, the State could not stop Hill from representing himself. Hill stated that he did not want to represent himself and that he would like the court to give him time to hire an attorney.

¶15.    The trial court asked Mallette to respond. Before Mallette responded, Hill said, "Well, I'll just continue with Stephanie and I don't have a fair trial, I mean, it's cool. I'll continue." The trial court stated that it would require Mallette to continue as shadow counsel if Hill insisted on representing himself and asked Hill if he wished to continue by himself or with Mallette as his attorney. Hill responded that Mallette could continue to be his attorney. The jury was selected, and the trial proceeded.

¶16.    Stephen was the first witness to testify. After Stephen was excused, the court took a fifteen-minute recess. At the conclusion of the recess, but before the jury was brought back in, Hill again asserted his desire to represent himself. The trial court informed Hill that he had the absolute right to represent himself and again told Hill the likely consequences of doing so. The trial court stated that, should Hill like to represent himself, it would appoint

---

[5]Mallette pointed out that Rule 8.05 no longer existed. The trial court stated that the corresponding Mississippi Rule of Criminal Procedure was substantially similar and that it believed that Hill had been advised properly of the probable effect of representing himself.

8

Mallette as his standby counsel. Hill responded:

> Sir, no, sir, I do not want her as my shadow or anything because she's not –
> she just told me, fuck me. Excuse my language. She just said, fuck me, and
> I've been dealing with this since this lady been on my case, sir, and I – that's
> the reason why I do not want . . . Stephanie Mallette as my attorney because
> all she do is threaten my life. She tell me I'm gonna die in prison. She don't
> have no confidence in this case. She's not asking the right questions. She's not
> trying to fight under no circumstances.

The trial court again stated that it would allow Hill to represent himself, but, whether Hill objected or not, the trial court was going to appoint Mallette as advisory counsel. Hill responded that he was under emotional distress and asked for a continuance. The trial court denied the continuance and stated that Hill could use Mallette as much or as little as he needed to.

¶17.    Hill responded that he was not having a fair trial and asked why the trial court had removed Talley's counsel but still required Hill to be at court. The trial court questioned the relevance of Hill's question. Hill continued talking, making an incriminating statement in the process: "Your Honor, he's a witness in this case just as well as I am. He was there at the same time I was there." The trial court suggested that Hill not make any further statements and stated that it was an excellent example of why Hill needed counsel. Hill then made another incriminating statement, saying "I mean, I never denied not being there no way, your Honor." The trial court stated that it would not change its ruling and that Hill could represent himself or continue with Mallette as counsel. Hill then repeatedly asked the trial court for a continuance to appoint a new attorney. The trial court again denied Hill's requests. Hill became recalcitrant and refused to answer the trial court's questions about whether or not he

9

would like to represent himself, so the trial court stated that it would proceeded with Mallette as his representative.

¶18. Shortly afterward, Mallette requested a hearing in chambers. Mallette stated, "I'm not sitting by him. They're fighting with him down the hall. I am scared to death he's going to jump on me." The trial court stated that it had never encountered such a situation and asked if Mallette could sit far enough away from him. The hearing proceeded as follows:

> MALLETTE: And he just screamed, I did not rape anybody, I'm innocent, down the hall and I know the jury heard him. There's no doubt the jury heard him.
> COLOM: Yeah. He's acting a fool.
> GARLAND: Yeah. Bailiffs just kind of all tackled him, so –
> COLOM: We need to research that because I think there – you can prosecute somebody in their absence.
> MALLETTE: No. Only – no. You have to – Judge Howard – you might want to ask Judge Howard about this because he dealt with this with a crazy one and you have to do the minimal amount of restraint that's safe.
> . . .
> THE COURT: That is, you're going to research the law and tell me what I need to do. I've never had a – I've had a few jump up and yell stuff every once in awhile, but I've never had somebody that's acting this belligerent before and, of course, there's no way I can control him because holding him in contempt is absolutely –
> . . .
> MALLETTE: Your Honor, my concern is, one, he's going to escalate until he gets what he wants. That is my legitimate concern that until he gets his way, he's going to resort – and I'm the one that's got to sit over there beside him, so –
> . . .
> THE COURT: All right. The Court is faced with an unusual situation and that is, outside the presence of the jury, the Defendant, Mr. Terry Hill, became extremely belligerent and noisy and disruptive and I am informed that the bailiffs have had to subdue him as he was going down the hallway. The Court isn't sure what restraints will be necessary on him to continue the trial and by agreement of Counsel, State and Defense, the Court is now going to call the jury back in and recess until one o'clock this afternoon. . . .

After recess, the trial court stated that Hill had calmed down after a "number of deputies" had put him in a jail cell during recess. The trial court decided to place bailiffs next to Hill during the course of the trial. It stated that, although Hill had expressed dissatisfaction with Mallette, the court had not seen anything other than good representation by her.

¶19.    Mallette moved for a mistrial at this point, arguing that Hill had been screaming that he was innocent and that he had not raped anybody while he was being taken to the cell and that his voice likely could be heard inside the jury room. The trial court instead held that a limiting instruction would be given. Mallette then made another motion to withdraw, alleging that the previous week Hill had threatened to humiliate her and hurt her and, given his conduct at trial, she had no reason to believe that he did not intend to act on his threats. Mallette stated that she was afraid of him, that she was scared of him, and that she no longer had any desire to represent him. She stated that, if the court ordered her to continue representing Hill, she would represent him to the best of her ability, but that her representation would not be one-hundred percent because she was afraid he would hurt her. In an attempt not to alert the jury that extra security measures had been taken, the trial court decided a plain-clothes policeman would sit between Mallette and Hill and that two bailiffs would stand close by. If Mallette needed to confer with Hill, she was instructed to make a motion to the court; the court then would order a recess, enabling Mallette and Hill to go the visitor room at the jail and to confer through the telephones.

¶20.    Mallette objected to having any law enforcement officers around Hill, arguing that it created an unnecessary impression that he was dangerous and stating that Hill had assured

11

the court that he would not act up anymore. The trial court noted her objection but stated that the officer was in plain clothes and that he did not occupy a position like a deputy sheriff where he would be widely known in the community. In addition, one bailiff was four feet behind Hill and the other bailiff was approximately ten feet from Hill. The trial court stated that bailiffs normally were seen in the courtroom and, therefore, should not be extremely noticeable.

¶21. The trial court gave a limiting instruction to the jury when it returned, and the trial again proceeded. Mallette's main defense during trial was to attack the chain of custody for the DNA samples from the rape kit and buccal swab and to challenge the integrity of the DNA samples because the samples had not been refrigerated at all times or stored correctly. Hill opted not to testify, and the defense rested without calling any witnesses.

¶22. The jury found Hill guilty of Count I, Robbery; Count II, Kidnapping of Stephen; Count III, Kidnapping of Carly; and Count IV, Sexual Battery. Because the defendant was indicted as a habitual offender pursuant to Mississippi Code Section 99-19-81, the trial court sentenced Hill to serve a term of fifteen years for robbery, thirty years for each count of kidnapping, and thirty years for sexual battery. The sentences were to run consecutively.

¶23. Hill filed a Motion for a New Trial or in the Alternative a Judgment Notwithstanding the Verdict, alleging numerous errors by the trial court. The trial court denied the defendant's motion.

¶24. On appeal, Hill raises one issue: whether the trial court erred in denying both Mallette's motion to withdraw and Hill's motions for new counsel, the denial of which

12

forced Hill to proceed to trial without adequate representation.

## DISCUSSION

¶25. Hill argues that, in refusing to allow Mallette to withdraw from representation, the trial court denied Hill his right to counsel under the Sixth Amendment. The Sixth Amendment to the United States Constitution states, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Mississippi Constitution provides a similar right: "In all criminal prosecutions the accused shall have a right to be heard by himself or counsel, or both . . . ." Miss. Const. art. 3, § 26. "This adept representation encompasses two broad principles: minimum competence and loyal assistance." *Rinehart v. State*, 883 So. 2d 573, 577 (Miss. 2004). In addition, due process of law requires the undivided loyalty of defense counsel. *Kiker v. State*, 55 So. 3d 1060, 1065 (Miss. 2011).

¶26. When considering a motion to withdraw as counsel, the trial court enjoys complete discretion. *Hill v. State*, 134 So. 3d 721, 725 (Miss. 2014). Hill's contention that he was denied his right to counsel is based on two arguments: 1) that denying Mallette's final motion to withdraw essentially forced Hill to proceed to the end of trial with counsel who could not represent him without conflict, and 2) that Mallette's fear of Hill left him with an attorney who could not give him "undivided loyalty."

¶27. Previously, this Court has held that, in order to grant a substitution of counsel during trial, "the defendant must show good cause, such as a conflict of interest, a complete breakdown of communication, or an irreconcilable conflict which leads to an apparently

13

unjust verdict." ***Taylor v. State***, 435 So. 2d 701, 703 (Miss. 1983) (quoting ***McKee v. Harris***, 649 F.2d 927 (2d Cir. 1981)) (internal citation omitted). "[C]ertain restraints must be put on the reassignment of counsel lest the right be 'manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice.'" ***Id.*** (internal citation omitted). In ***Taylor***, prior to trial, the defendant's attorney filed a motion to withdraw from representation, arguing that the defendant had threatened to kill him and had refused to cooperate with him in any way. ***Id.*** at 702. At trial, the defendant refused to speak with his attorney and argued that his attorney had not subpoenaed certain witnesses. ***Id.*** at 704. This Court affirmed the trial court's decision to deny a continuance and discussed the absurdity that would occur if an accused was allowed to "fall out" with his attorney immediately prior to trial and then insist on a continuance. ***Id.***

¶28. Here, the trial court acted within its discretion in denying Hill's motions for a continuance and a new attorney and Mallette's motion to withdraw. Four days before trial began, Hill twice stated to the trial court that he wanted Mallette to represent him. After trial proceedings began, Hill requested a new attorney, alleging that he had asked for certain witnesses in the case and that Mallette had not listed those witnesses. Hill, however, failed to provide, both at trial and on appeal, the names of those witnesses or any detail as to the potential testimony of those witnesses. Thus, Hill has not demonstrated how the witness testimony would have resulted in a different outcome. *See **Puckett v. State***, 879 So. 2d 920, 941 (Miss. 2004).

¶29. Additionally, the record does not indicate that Mallette was derelict in her duty to

14

represent Hill. "The test is whether the accused has been protected, so far as counsel can do so, in all of his legal rights." ***Augustine v. State***, 201 Miss. 277, 293, 28 So. 2d 243, 247–48 (1946). Mallette raised appropriate objections and cross-examined the State's witnesses. Further, Mallette repeatedly attacked the validity of the DNA evidence introduced at trial, questioning witnesses about the lack of refrigeration and improper storage of the DNA samples as well the chain of custody for the evidence. When an attorney provides adequate representation, a personality conflict between an attorney and a client is insufficient to establish an actual conflict. ***Rowsey v. State***, 188 So. 3d 486, 498-99 (Miss. 2015). "Counsel is presumed to be competent. . . . An indigent criminal defendant is not entitled to expert counsel, or to counsel of his own choosing, but only to reasonably effective assistance of counsel." ***Id.*** at 499 (citations omitted).

¶30.    Although Hill argues that the trial court essentially forced him to proceed to the end of trial with counsel who could not represent him without conflict, any conflict that existed at trial was the result of Hill's own actions. Hill became "belligerent" and had to be restrained by the bailiffs. Mallette then became concerned for her own safety and moved to withdraw from representation. After considering its options during a recess, the trial court decided that the best option to continue at that point was to place a plain-clothes policeman between Mallette and Hill and to be sure two deputies were in the courtroom. It specifically stated that, should Mallette and Hill need to confer, the two could do so by passing notes. Mallette also could, on motion, be granted a recess so that she could talk to Hill through the telephone at the jail.

15

¶31. The trial court opted for the least restrictive safety measures available to Hill. As stated in *Taylor*, absurd results would occur if a defendant was granted a mistrial or continuance after acting "belligerent" during trial proceedings. *Taylor*, 435 So. 2d at 704. *See also Fairley v. State*, 467 So. 2d 894, 899 (Miss. 1985) (stating that absurd results would occur if a defendant was granted a claim of inadequate representation after refusing to cooperate at trial with appointed counsel). In addition, we cannot state with any certainty that the conflict between Mallette and Hill led to an apparently unjust verdict. The State presented substantial evidence against Hill, including eyewitness testimony, video-camera footage, and DNA evidence.

## CONCLUSION

¶32. Accordingly, because Hill affirmatively stated four days before trial that he would like Mallette to represent him, because any conflict that existed was the result of Hill's own actions, because Mallette adequately represented Hill, and because of the overwhelming evidence introduced against Hill, we find that the trial court's denial of Mallette's motion to withdraw did not deprive Hill of due process or a fair trial. The trial court acted within its discretion in denying Hill's requests for new counsel and in denying Mallette's motion to withdraw. Therefore, we affirm the judgment of the trial court.

¶33. **AFFIRMED.**

**WALLER, C.J., RANDOLPH AND KITCHENS, P.JJ., COLEMAN, MAXWELL, BEAM, CHAMBERLIN AND ISHEE, JJ., CONCUR.**