63 P.3d 420

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Bradford W. KOSSMAN, Defendant–Appellant.**

No. 24245.

Intermediate Court of Appeals of Hawai'i.

Jan. 17, 2003.

Certiorari Denied Feb. 27, 2003.

Mimi Desjardins, on the briefs, for defendant-appellant.

Tracy A. Jones, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

Bradford W. Kossman (Kossman) appeals the March 8, 2001 judgment of the circuit court of the second circuit[1] that convicted him, upon a jury's verdict, of the offense of place to keep firearm, in violation of Hawai'i Revised Statutes (HRS) § 134–6(c) (1993 & Supp.2001),[2] and sentenced him to five years

---

1. The Honorable Artemio C. Baxa presided over the pretrial proceedings in this case. The Honorable Douglas H. Ige presided over the jury trial and sentencing, and entered the March 8, 2001 judgment.

2. Hawai'i Revised Statutes (HRS) § 134–6(c) (1993 & Supp.2001) provides that "[e]xcept as provided in sections 134–5 [(concerning target shooting and licensed firearm hunting)] and 134–9 [(regarding licenses to carry firearms)], all firearms and ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms or ammunition or both in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following: a place of repair; a target range; a licensed dealer's place of business; an organized, scheduled firearms show or exhibit; a place of formal hunter or firearm use training or instruction; or a police station. 'Enclosed container' means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm."

of probation upon terms and conditions, including ten days in jail and one thousand hours of community service. We affirm.

## I. Background.

On May 1, 2000, Kossman was charged, via indictment, as follows:

That on or about the 27th day of September, 1998, in the County Maui, State of Hawai'i, BRADFORD W. KOSSMAN did, without being in compliance with Sections 134–5 and 134–9 of the Hawai'i Revised Statutes, intentionally, knowingly, or recklessly carry on his person or have in his possession a pistol or revolver, to wit, a .38 caliber derringer, without it being within an enclosed container, and in a place other than his place of business, residence, or sojourn, thereby committing the offense of Place to Keep Firearm in violation. of Section 134–6 of the Hawai'i Revised Statutes.

At an August 21, 2000 trial call hearing, Kossman informed the court that one of his "main character witnesses" would not be available to testify on a scheduled trial date. The deputy prosecuting attorney (DPA) interjected:

As Mr. Kossman states, this is supposed to be a character witness. Clearly, a character witness would not be allowed to testify in any event, so perhaps, he can discuss that with [his public defender,] Mr. Hiyakawa (sic), also.

On September 1, 2000, Kossman's public defender, Lee S. Hayakawa (Hayakawa), filed a motion to. withdraw as counsel and have substitute counsel appointed. Hayakawa's declaration in support of the motion read, in pertinent part, as follows:

2. On August 24, 2000, at a pretrial conference [Kossman] met with Deputy Public Defender WENDY HUDSON who was standing in for [me]. At this meeting, [Kossman] indicated to Ms. Hudson that he would like to speak to [my] supervisor, that he would like the Office of the Public Defender to withdraw from his case, and that he wanted new counsel. [Kossman] clearly expressed his desire to discharge [me].

3. At the call to roll on August 28, 2000, [I] met with [Kossman] at court and [he] expressed his desire for new counsel based on the fact that [Kossman and I] "do not see eye to eye on how to proceed with the defense." [I] confirmed [Kossman's] request to discharge [me] and [Kossman] was certain that he would like new counsel.

4. [Kossman's] dissatisfaction with [me] dates back to numerous meetings with [Kossman] which have become heated at times where [I have] refuse[d] to pursue particular witnesses and strategies on which [Kossman] insists.

5. Based on the representations by [Kossman], [I] feel[ ] that [Kossman] does not. trust [me] and feels that [I am] not looking out for [Kossman's] best interests.

6. [I am] of the belief that further efforts by [me] to assist [Kossman] with his . case, including representing [Kossman] at subsequent hearings, including trial, would be futile as it appears [Kossman and I] have irreconcilable differences.

The entire argument contained in the memorandum in support of the motion was as follows:

Rule 1.16 of the Hawai'i Rules of Professional Conduct ("HRPC") states in pertinent part:

[A] lawyer shall not represent a client or, where representation has commenced, *shall* withdraw from the representation of a client if:

(1) the representation will result in violation of the Rules of professional [ (sic) ] Conduct or other law;

. . .

(2) the lawyer is discharged.
(Emphasis added)

In the case at bar, [Kossman] has unequivocally discharged [Hayakawa]. [Kossman] stated that he does not want [Hayakawa] or the Office of the Public Defender to represent him in the above-entitled case.

Furthermore, based on [Kossman's] opinion of [Hayakawa], [Hayakawa] would be in violation of Rule 1.1 and Rule 1.3 of the HRPC if representation of [Kossman] continues.

HRPC Rule 1.1 requires a lawyer to provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonable [ (sic) ] necessary for the representation.

HRPC Rule 1.3 requires that a lawyer act with reasonable diligence and promptness in representing a client.

In the case at bar, [Hayakawa] has been placed in a position in which he is unable to be competent or diligent. [Kossman] has alleged that [Hayakawa] has been ineffective in representing him. [Kossman] no longer trusts [Hayakawa] and refuses to cooperate with [Hayakawa].

The motion was heard on September 13, 2000. During this hearing, the following colloquy occurred:

THE COURT: Mr. Hayakawa, good morning.

Mr. Kossman, I read the motion to withdraw counsel. It appears that you are the one—it looks like you are—your counsel is withdrawing as counsel because he is saying that you are dictating on how to proceed with the case. Is that correct?

[KOSSMAN]: No, your Honor. I asked him if it was possible in the trial to let the truth about the situation come out about what my lifestyle at the time was like and what I was doing. And that seemed to not agree with his limitation of the facts coming out. And with that we—he seemed to be trying to yell me out of it, or argue me out of it. And I just thought that possibly someone felt a little bit like I could, you know, the way I thought that we should bring out the evidence or of the truth about what was happening in the situation. That is only what happened. And—

THE COURT: Well, let me tell you this. Your attorney—of course I am not saying that you do not know as much as your attorney in term of the legal matters, but your attorney is the one who went to law school. He is supposed to be the one who would know how to present this case in the proper way.

[KOSSMAN]: Your Honor, there was some innuendos and some derogatory remarks that went on during our pretrial conferences. And those things kind of persuaded me that he sounded more like my prosecutor than he did my public defender.

A vigilante. I am not a vigilante. I am not a liar. Those are things that are pretty harsh for someone who has been a public servant for 15 years on this island. And I can't even bring out my past or anything to do with my prison ministry or anything to do with the street ministry that I am working in.

THE COURT: Let me just mention to you before I do anything here.

You know, the Public Defender's Office here is noted for their quality of their representation of the clients. That is what I am telling you. You are asking me to appoint another attorney.

[KOSSMAN]: Just because of the reaction that I have had to some of his comments. I really don't think that he's defending me. I think he's processing me, your Honor.

THE COURT: Prosecuting you?

[KOSSMAN]: No. Processing me through. The process of bargaining away my day in court.

And I just—the first—Eileen was my first Public Defender. And she suggested I become a felon and take jail and five years probation. Your Honor, I feel like I deserve a day in court. I don't feel that I am guilty, and I don't think I deserve to be a felon for the rest of my life.

THE COURT: Well, you will also have a day in your court here.

The question is I do not find sufficient basis for the appointment of another attorney for you.

[KOSSMAN]: It is your court, your Honor. It is up to you.

THE COURT: Mr. [deputy prosecuting attorney], do you have any comment here?

[DPA]: Well, Your Honor, no. I not only read the motion and I have listened to Mr. Kossman now. The things that he is mentioning he may feel, not being an attorney, that these are relevant to his case. But most of the things that he is talking

about, I would—I would state would be character evidence.

The State of course would object to their admission at any trial. Quite frankly, their relevance, his ministry, what he has been doing with himself, that is probably at the crux of this issue, Judge. If his attorney is telling him these things would not be admissible in a trial and he takes offense at that, perhaps that's where we are getting in conflict of personalities.

Judge, obviously, this motion is in your discretion. It doesn't occur to the State, however, as the Court has already indicated, it is not appropriate for someone to come in and basically start picking and choosing which attorney in the Public Defender's Office they wish to have represent them.

THE COURT: Yes.

Mr. Kossman, I am going to deny your motion.

Mr. Hayakawa, you are—you are the one who filed the motion to withdraw. I am going to deny it.

Kossman's jury trial commenced on December 11, 2000. The issue of character evidence came up once more just before trial, when the court entertained motions *in limine*. During that hearing, the DPA offered that "the State has no objections to Karen Kossman [ (Kossman's wife) ] being allowed to testify as long as it does not go to character testimony."

Evidence presented at trial revealed the following: On September 27, 1998, visitor Ferdinand Evangelista (Evangelista) found a yellow waist pack, or fanny pack, near some pay phones on the premises of the Grand Wailea Resort hotel. Evangelista took the fanny pack to the art gallery at the hotel and had a gallery employee call hotel security. The security officer who responded to the call was Cordell Chang (Chang).

Pursuant to the hotel's lost-and-found protocol, Chang opened the fanny pack and performed a complete inventory of its contents in the presence of the finder, Evangelista. During his inventory of the fanny pack, Chang discovered a Hawai'i driver's license; an expired, out-of-State gun permit; and a Derringer firearm in a sock. There was also "a lot more stuff in the bag[.]" Following his inventory of the fanny pack, Chang took the fanny pack to the hotel's security office and presented it to his security director, John Ladd (Ladd).

Ladd opened the fanny pack and confirmed the presence of a firearm. At this point, Ladd placed a call to the Maui Police Department. Police officer Christopher Robert Horton (Officer Horton) was dispatched to the security office. When Officer Horton arrived, Ladd directed the officer's attention to the found property, which was laid out on a desk. Next to the fanny pack was a "chrome-plated" Derringer lying on a sock. Officer Horton examined the Derringer and found two "hollow point .38 caliber rounds" loaded into it. Officer Horton unloaded the gun for safety reasons.

Officer Horton and Ladd then proceeded to do a complete inventory of the items in the fanny pack. Ladd remembered—"right off the top of my head"—that the fanny pack contained "a permit for a weapon, and I think it came from the State of Florida[,] ... a food stamp[,]" and "a Hawai'i driver's license maybe." Officer Horton remembered that the fanny pack held several pay stubs from Maui Dive Shop, a key chain with five keys on it, approximately $50.57 in currency, eyeglasses and a case for the eyeglasses monogrammed with the name Bradford W. Kossman, a small bottle of vitamin C, two nail clippers, a velcro wallet containing Kossman's Hawai'i driver's license and his expired Florida gun permit, and a bifold leather wallet containing the business cards of various other people.

Officer Horton went to Kossman's address. Kossman was not at home, but Officer Horton happened upon the resident landlord, who informed him that Kossman was in the process of moving out and gave him Kossman's phone number. Officer Horton then went to the Keala substation in Kihei, where he called Kossman's number. No one answered, so Officer Horton left a message on the answering machine: that the police had property belonging to Kossman and that he would have to contact them to retrieve it.

Officer Horton did not mention the Derringer.

Later that evening, Kossman arrived at the Keala substation. When he arrived, he asked Officer Horton whether the police had found his fanny pack. At that point, Officer Horton saw that his interlocutor was the Bradford W. Kossman portrayed on the Hawai'i driver's license and the Florida gun permit found in the fanny pack. When Officer Horton confirmed that they had found his fanny pack, Kossman "immediately asked if his gun was still inside." Officer Horton responded, " 'Yes, your gun was still inside. However, you need to understand that this is a criminal matter, and I need to advise you of your constitutional rights before proceeding.' " Kossman indicated that he understood Officer Horton's caveats, but before Officer Horton could read Kossman his rights, Kossman told Officer Horton that he had the gun in his fanny pack because of recent robberies at his workplace, Maui Dive Shop. After Officer Horton read Kossman his rights, Kossman elected to remain silent.[3] Kossman was arrested, then released pending investigation. His belongings were returned to him, with the exception of the Derringer, the ammunition and the sock.

After the State rested its case, the court granted the State's motion *in limine* to preclude Kossman from testifying that he was employed, part-time, as a lay minister. In Kossman's defense, Kossman and his wife, Karen Kossman, both testified that Kossman did not know his gun was in his fanny pack, because his wife had placed it in the fanny pack in the process of moving house and had not had a chance to tell him about it. She told him about it only after he got Officer Horton's message. In the course of his testimony, Kossman mentioned, in non-responsive answers to the DPA's cross-examination, that "we [ (he and his wife) ] had an opportunity to open a rescue mission," and that he had "wanted to start a mission" next to the Maui Dive Shop location. In the course of her testimony, Karen Kossman mentioned, in a non-responsive answer to Hayakawa's direct examination, that when she and Kossman first arrived on Maui, "We lived in the youth house. We were invited over as missionaries, and there is a youth mission house in Paia, and that's where our station was in October of 1986."

The jury retired to its deliberations at 12:48 p.m. on December 13, 2000. At 3:05 p.m. that same day, the jury returned a guilty verdict. At his sentencing, Kossman made a lengthy statement to the court. In it, Kossman maintained his innocence and explained that he had wanted to present evidence of his street and prison ministries, along with character witnesses, at his trial. Kossman added:

> And my whole defense was planned for that day. And we went out to lunch, and when we came back in, my Counsel advised me that everything that I had done in the last 17 years with the religious nature was not able to be brought out. And that really pulled the rug right out of my heals [ (sic) ].
>
>  . . . .
>
> So that's the first time that [the DPA] and I, he stood up and said that my credibility as a street minister and prison preacher didn't really mean anything. And I think that's what set this off.
>
> But yes, your Honor, just in the trial, the statement—I had to sit through [the DPA's] presentation and wished that I could have got up and said that's not true, that isn't true, that isn't the way it was. And I thought that I could somehow get that in.
>
> But Mr. Hayakawa would have presented—he had already prepared his thing and it didn't go. . . .

## II. Discussion.

### A. *The Motion to Withdraw as Counsel and Have Substitute Counsel Appointed.*

On appeal, Kossman first avers that "the trial court abused its discretion when it de-

---

**3.** At a voluntariness hearing held before the start of trial, Maui Police Department officer Christopher Robert Horton (Officer Horton) testified that after he read Bradford W. Kossman (Kossman) his constitutional rights, Kossman refused to make any more statements. According to Officer Horton, Kossman remarked that "if the matter was that serious, he didn't want to make a statement."

nied Kossman's pre-trial motion to withdraw and substitute counsel." Opening Brief at 11 (capitalization omitted). In doing so, Kossman asserts, the court violated his right to the effective assistance of counsel guaranteed by the sixth amendment[4] and the due process clause of the fourteenth amendment[5] to the United States Constitution, and article I, section 14[6] of the Hawai'i Constitution. We disagree.

■ "We review for abuse of discretion a lower court's denial of a motion to substitute new court-appointed counsel." *State v. Char*, 80 Hawai'i 262, 267, 909 P.2d 590, 595 (App.1995) (citations omitted). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Cullen*, 86 Hawai'i 1, 9, 946 P.2d 955, 963 (1997) (internal quotation marks, block quote format, and citations omitted).

■ "[T]here is no absolute right, constitutional or otherwise, for an indigent to have the court order a change in court-appointed counsel." *State v. Torres*, 54 Haw. 502, 504, 510 P.2d 494, 496 (1973) (citations omitted). "[C]ertain restraints must be put on the reassignment of counsel lest the right be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." *State v. Soares*, 81 Hawai'i 332, 354, 916 P.2d 1233, 1255 (App.1996) (internal quotation marks and citations omitted), *overruled on other grounds by, State v. Janto*, 92 Hawai'i 19, 986 P.2d 306 (1999). Hence, the trial court's decision will not be overturned on appeal unless "there was an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to *effective* assistance of counsel." *Torres*, 54 Haw.

at 505, 510 P.2d at 496 (citations omitted; emphasis in the original).

■ In *Soares*, we held that "when an indigent defendant requests that his or her appointed counsel be replaced, the trial court has a duty to conduct a 'penetrating and comprehensive examination' of the defendant on the record, in order to ascertain the bases for the defendants's request." *Soares*, 81 Hawai'i at 355, 916 P.2d at 1256 (quoting *State v. Kane*, 52 Haw. 484, 487–88, 479 P.2d 207, 209 (1971)). In this regard, Kossman argues that, although the court held a hearing on the motion to withdraw, the court's examination of him was not the penetrating and comprehensive examination required of the court by *Soares*:

> [Hayakawa] raised serious issues pointing to a complete breakdown of trust and confidence between he and [Kossman].
>
> . . . .
>
> The trial court here harped solely on the issue of whether [Hayakawa] was competent. The trial court completely disregarded the requirement that it look into the ˙complaint being made by [Kossman] and determine its validity.

Opening Brief at 14, 17. Granted, the court's examination of Kossman was less than exemplary. However, the penetrating and comprehensive examination required of the court by *Soares* is not an end unto itself, but merely a means to an end:

> This inquiry is necessary to protect the defendant's right to effective representation of counsel, and must be sufficient to enable the court to determine if there is good cause to warrant substitution of counsel.

*Soares*, 81 Hawai'i at 355, 916 P.2d at 1256 (brackets, internal quotation marks and citations omitted). Even without the penetrat-

---

**4.** The sixth amendment to the United States Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

**5.** The fourteenth amendment to the United States Constitution provides, in pertinent part, that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law[.]"

**6.** Article I, section 14 of the Hawai'i Constitution provides, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for the accused's defense. .... The State shall provide counsel for an indigent defendant charged with an offense punishable by imprisonment."

ing and comprehensive examination required of the court by *Soares*, it was clear from the colloquy that occurred at the hearing (and it is obvious from the whole record) that there was no good cause to warrant substitution of counsel. Quite simply, Kossman wanted Hayakawa to proffer character evidence and character witnesses on Kossman's behalf at trial, and Hayakawa felt, correctly,[7] that he could not.

There is no mechanical test for determining whether good cause exists which would warrant the appointment of substitute counsel for an indigent defendant, and each case must therefore be evaluated on its particular circumstances, *Commonwealth v. Nicolella*, 307 Pa.Super. 96, 452 A.2d 1055, 1057 (1982), applying an objective standard. *McKee v. Harris*, 649 F.2d 927, 932 (2d Cir.1981) (rejecting defendant's suggestion that good cause be determined solely according to the subjective standard of what defendant perceives since applying such a standard would convert the requirement of good cause into an empty formality and entitle defendant to demand reassignment of counsel simply on the basis of a "breakdown in communication" defendant himself or herself adduced), *cert. denied*, 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

*Soares*, 81 Hawai'i at 355, 916 P.2d at 1256. There is no good cause to warrant substitution of counsel where a defendant insists that his attorney proffer clearly inadmissible evidence at trial, despite being advised by his attorney that the evidence is of that nature. The record reflects that this, and only this, engendered the disagreements between Kossman and Hayakawa, and Kossman does

not argue otherwise on appeal. For us to accept this as good cause for substitution of counsel would, indeed, "convert the requirement of good cause into an empty formality and entitle defendant to demand reassignment of counsel simply on the basis of a 'breakdown in communication' defendant himself or herself adduced[.]" *Id.* (citation omitted).

▮▮▮▮ Kossman nevertheless insists on appeal that there was, for whatever reason, a "complete breakdown of trust and confidence between [Hayakawa] and [Kossman]." Opening Brief at 14. Kossman also asserts that, as a result of the breakdown and his allegations of Hayakawa's ineffectiveness, Hayakawa was unable to fulfill his professional responsibilities to his client and was, indeed, in a position of conflict of interest. All of this, Kossman concludes, mandated substitution of counsel. These averments track closely an observation this court made in *Soares*:

Some courts have held, however, that good cause may be found where a conflict of interest exists on the part of defense counsel, or where there is a complete breakdown in communication or irreconcilable conflict between a defendant and his or her counsel which leads to an apparently unjust verdict.

*Soares*, 81 Hawai'i at 355, 916 P.2d at 1256 (citations omitted). Yet, at the hearing on the motion to withdraw as counsel and have substitute counsel appointed, Kossman complained only of his disagreements with Hayakawa about character evidence and the advisability of a plea bargain with the State.

---

7. Hawai'i Rules of Evidence (HRE) Rule 402 (1993) provides, in pertinent part, that "[e]vidence which is not relevant is not admissible." HRE Rule 404(a)(1) (Supp.2001) provides, in relevant part, that "[e]vidence of a person's character or a trait of a person's character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except: ... Evidence of a pertinent trait of character of an accused offered by an accused, or by the prosecution to rebut the same[.]" HRE Rule 405(a) (1993) provides, in relevant part, that "[i]n all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On

cross-examination, inquiry is allowable into relevant specific instances of conduct." HRE Rule 608(a) (1993) provides, in pertinent part, that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) The evidence may refer only to character for truthfulness or untruthfulness, and (2) Evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." HRE Rule 610 (1993) provides that "[e]vidence of beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced."

Hayakawa, for his part, was conspicuously silent at the hearing, save for his initial appearance and a *pro forma*—"Thank you, your Honor."—at the end of the hearing. And thereafter, both Kossman and Hayakawa proceeded smoothly through trial without raising or implicating any further issues of communication, ineffectiveness or conflict. This is far from the "complete breakdown of trust and confidence" between attorney and client, or the ineffectiveness of counsel, that Kossman asserts on appeal. At most, Kossman was dissatisfied with the advice Hayakawa was tendering. At the very least, Hayakawa rendered a complete and adequate defense on behalf of Kossman.[8] That the jury did not buy it is, *ipso facto*, no reason to deem it ineffective in hindsight. At any rate, we are concerned only

> where a conflict of interest exists on the part of defense counsel, or where there is a complete breakdown in communication or irreconcilable conflict between a defendant and his or her counsel which leads to an apparently unjust verdict.

*Id.* (citations omitted). And we cannot discern, in this record, a disqualifying conflict of interest or "an apparently unjust verdict."

▄▄ For his final argument on this point of error, Kossman contends the court abused its discretion in failing to advise him that he had a choice between proceeding to trial with Hayakawa or proceeding *pro se*. For this argument, Kossman relies on *Char, supra*. In *Char*, we held:

> A "waiver" is the defendant's intentional and voluntary relinquishment of a known right. *United States v. Goldberg*, 67 F.3d 1092, 1098 (C.A.3, 1995). In criminal cases, an indigent defendant is deemed to have waived by conduct, *id.* at 1100, his or her right to the services of the public defender or court-appointed counsel if the following six requirements are satisfied: (1) the defendant requested a substitute court-appointed counsel; (2) the defendant was afforded a reasonable opportunity to show good cause for a substitute court-

appointed counsel; (3) the trial court did not abuse its discretion when it decided that a substitute court-appointed counsel was not warranted; (4) the requirements of *State v. Dickson*, 4 Haw.App. 614, 619–20, 673 P.2d 1036, 1041 (1983), were satisfied; (5) the defendant was given a clear choice of either continuing with present counsel or being deemed to have waived by conduct his or her right to counsel; and (6) the defendant refused to continue with present counsel.

*Char*, 80 Hawai'i at 268–69, 909 P.2d at 596–97 (footnote omitted). *See also Soares*, 81 Hawai'i at 355–56, 916 P.2d at 1256–57. As indicated, however, Char was forced to trial *pro se*, after his fourth court-appointed attorney's motion to withdraw was granted upon Char's refusal to proceed with that attorney, and the trial court refused to appoint substitute counsel. *Char*, 80 Hawai'i at 264–66, 909 P.2d at 592–94. Here, Kossman elected to continue with Hayakawa, and did so without further protest, after the court found no good cause to substitute counsel. In Kossman's words, "It is your court, your Honor. It is up to you." Thus, *Char* is inapposite. Kossman does not, in any event, aver that he wanted to go to trial *pro se*, in what would have been a feckless attempt to present a clearly inadmissible defense. This record clearly shows that what Kossman wanted, bottom line, was a new court-appointed attorney more amenable to Kossman's view of the rules of evidence.

On this point of error, in sum, we do not believe the court's denial of the motion to withdraw as counsel and have substitute counsel appointed "was an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to *effective* assistance of counsel." *Torres*, 54 Haw. at 505, 510 P.2d at 496 (citations omitted; emphasis in the original).

**B. Unreasonable Search and Seizure and Ineffective Assistance of Counsel.**

▄▄ Kossman next asserts that "the trial court … erred when it admitted all of

---

**8.** *Cf. State v. Torres*, 54 Haw. 502, 507, 510 P.2d 494, 497 (1973) (in deciding whether the trial court abused its discretion in not granting newly substituted court-appointed counsel a continu-

ance to prepare for trial, "[a]nother factor entitled to great weight is counsel's performance at trial").

the evidence obtained from the search of the fanny pack by Officer Horton. The evidence consisted of all of [Kossman's] identification as well as the evidence of his expired permit to carry a firearm from Florida. But for this evidence, there would have been no link between [Kossman] and the gun." Opening Brief at 21–22.[9] No motion to suppress that evidence was filed, and no objection was made to its admission at trial; hence, Kossman assigns this point of error as plain error.[10] Kossman argues as follows:

> Clearly, an issue regarding the warrantless search and seizure of the fanny pack existed and was brought out in the testimony of [the] State witnesses. It is clear from the trial record that the government never justified or provided any exception to the warrant requirement that would have justified Officer Horton'[s] actions.
>
> A search conducted without a warrant carries with it an initial presumption of unreasonableness. The government must show that the fact[s] of the case justified the police searching without a warrant. *State v. Perham*, 72 Haw. 290, 292, 814 P.2d 914, 916 (1991); *State v. Ritte*, 68 Haw. 253, 256, 710 P.2d 1197, 1201 (1985).

Opening Brief at 23.

■ "The determination of whether a search was lawfully conducted is entirely a question of law, which this court reviews *de novo* under the right/wrong standard." *In Interest of Doe*, 77 Hawai'i 435, 438, 887 P.2d 645, 648 (1994) (citation omitted).

■ While Kossman is correct that a warrantless search by the government is presumed to be an unreasonable search and seizure, *Ritte*, 68 Haw. at 256, 710 P.2d at 1201 ("A search conducted without a warrant carries with it an initial presumption of unreasonableness. The government must show that the facts of the case justified the police searching without a warrant and that the search itself was no broader than necessary to satisfy the need which legitimized the departure from the warrant requirement in the first place." (Citations omitted.)); *Perham*, 72 Haw. at 292, 814 P.2d at 915 (the same, quoting *Ritte*, *supra* ), there are exceptions to the warrant requirement. One of these exceptions is the lost property inventory.

In *State v. Ching*, 67 Haw. 107, 678 P.2d 1088 (1984), the supreme court held:

> Unlike a post-arrest inventory, identification of the owner far outweighs the State's other search purposes in searching lost property. When lost property is turned in to the police, their paramount goal must be to ascertain its ownership

---

9. Kossman also contends on appeal that "the 'fruit of the poisonous tree' doctrine, which 'prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police[,]' [*State v.*] *Fukusaku*, 85 Hawai'i 462, 475, 946 P.2d 32, 45 (1997)[,] would have also caused [Kossman's] statements at the police station to be suppressed as well." Opening Brief at 27.

10. "This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993) (citation omitted). "This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (brackets, citation and internal quotation marks omitted). Hawai'i Rules of

Penal Procedure (HRPP) Rule 52(a) (2000) provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." HRPP Rule 52(b) (2000) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The fourth amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article I, section 7 of the Hawai'i Constitution provides: "The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted."

and return it to the owner in substantially the same condition as it was received. We therefore hold that police may validly search lost property to the extent necessary for identification purposes.

*Id.* at 112, 678 P.2d at 1092–93. Because the evidence Kossman puts at issue on appeal was "all of [Kossman's] identification as well as the evidence of his expired permit to carry a firearm from Florida[,]" Opening Brief at 22, and because the expired Florida gun permit was picture identification as well, it would appear that Officer Horton's search of the fanny pack, to the extent it is questioned on appeal, was an unexceptionable lost property inventory under *Ching*.

Kossman acknowledges *Ching*, but argues that

this does not cure the bigger problem, which is that the fanny pack was not merely "lost property". It was, at that time, the focus of a criminal investigation. The purpose of searching the bag was to locate the name of the owner and bring him or her in for questioning, and not to contact them [ (sic) ] to retrieve the fanny pack. This is true because this is precisely what happened later. The prosecution argument, therefore fails.

Reply Brief at 4. But even assuming, *arguendo,* that Officer Horton's subjective motivation gives rise to a distinction that makes a difference in deciding the constitutionality of a lost property inventory, the fact remains that many important items other than the incriminating items were contained in the fanny pack and had to be returned to Kossman, and ultimately were.

██ We also note that Officer Horton knew, at the time of his inventory of the fanny pack, that it had contained a loaded firearm. Under such circumstances, the scope of a lost property inventory may constitutionally be extended—for example, to check for additional ammunition. The *Ching* court explained:

The police may also search lost property if necessary to safeguard the property, protect the police department from false claims, and protect the police from danger (for example, a bomb planted in "lost property"). These three interests, however,

are not as strong in the present case as they are in a post-arrest situation such as *[Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) ]. Safeguarding lost property while in police hands is a valid State interest but the possibility that it might contain something valuable is much less likely than in the post-arrest context because any valuables are often already missing by the time the lost article is given to the police. Protection of the police from false claims is also less vital in the lost property context. Unlike the post-arrest situation, a person making a false claim that the police have mishandled lost property is faced with proving that the allegedly missing property was taken by police rather than by an original finder. Moreover, prudently sealing the property will protect the police against false claims; when the police handle lost property as gratuitous bailees for the benefit of the owner they are liable only for acts of gross negligence or bad faith. *Lopes v. Brito,* 7 Haw. 679, 681 (1889). Finally, it is rare that lost property will pose a threat to the safety of the police or others, unlike the property of an arrestee.

Because the need to search for valuable or dangerous contents is usually not compelling in lost property situations, a warrantless search for these reasons is valid only if the facts support an objectively reasonable belief that the lost property contained valuable or dangerous contents and that a search of the property was necessary to safeguard the valuables, protect the police from false claims, or negate the danger presented. If the facts do not sustain this burden, the police must handle the lost property by the less intrusive means of enclosing it in a sealed container.

*Ching,* 67 Haw. at 112, 678 P.2d at 1093 (some citations omitted).

██ At any rate, we remember that Chang, a hotel security officer, conducted a complete inventory of the fanny pack in the presence of Evangelista, another private party, before Officer Horton did his inventory. It is well settled that the constitutional prohibition against unreasonable searches and sei-

zures applies only to government action. *State v. Boynton,* 58 Haw. 530, 536, 574 P.2d 1330, 1334 (1978). The constitutional protections apply "only if the private party in light of all circumstances of the case must be regarded as having acted as an instrument or agent of the state." *Id.* (citations, internal quotation marks and block quote format omitted). Kossman does not suggest on appeal that Chang or Evangelista was an instrument or agent of the State.

Kossman counters, however, that the search and seizure he puts at issue on appeal is not the prior search, but the one conducted by Officer Horton. Precisely. But according to the United States Supreme Court in *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), an individual's legitimate expectation of privacy, which is what actuates the constitutional prohibitions against unreasonable searches and seizures, is not implicated by a police search that does not exceed the scope of a previous search by a private party. *Id.* at 116, 104 S.Ct. 1652. *See also Walter v. United States,* 447 U.S. 649, 656–57, 100 S.Ct. 2395, 65 L.Ed.2d 410 (1980). Because Officer Horton's inventory revealed no more than what private parties had already discovered, the constitutional prohibitions were not transgressed.

We conclude, finally, that the court did not err, plainly or otherwise, in admitting evidence of items of identification recovered during Officer Horton's inventory of the fanny pack. Our conclusion also disposes of Kossman's final point of error on appeal, that Hayakawa rendered ineffective assistance of counsel because he failed to file a motion to suppress that evidence.

The burden of establishing ineffective assistance of counsel rests upon the appellant. His burden is twofold: First, the appellant must establish specific errors or omissions of defense counsel reflecting counsel's lack of skill, judgment or diligence. Second, the appellant must establish that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*State v. Antone,* 62 Haw. 346, 348–49, 615 P.2d 101, 104 (1980) (footnote and citations omitted). Upon our conclusion, it cannot be said that Kossman has met his burden in either respect.

### III. Conclusion.

The court's March 8, 2001 judgment is affirmed.