STATE OF HAWAI`I, Plaintiff-Appellee,
v.
WILLIAM D. ALSTON, Defendant-Appellant.
No. 28410.
Intermediate Court of Appeals of Hawaii.
March 31, 2009.
On the briefs:
Cynthia Kagiwada, for Defendant-Appellant.
James M. Anderson, Deputy Prosecuting Attorney, City and County of Honolulu, for Plaintiff-Appellee.

MEMORANDUM OPINION
WATANABE, Presiding Judge, NAKAMURA, and FUJISE, JJ.
Defendant-Appellant William D. Alston (Alston) was convicted of offenses including attempted murder in the second degree and kidnapping. Alston's convictions were based on events that transpired at the apartment of James Swann (Swann). Among other things, Alston allegedly stabbed Swann and set Swann on fire and restrained with the intent to terrorize Swann, Alston's wife, Lygeia Alston, also known as Lygeia Harris (Harris), James Marable (Marable), and Darlene Deal (Deal).
After a jury trial,[1] Alston was found guilty of attempted murder in the second degree of Swann (Count 1); kidnapping of Swann, Harris, Marable, and Deal (Counts 2, 4, 6, and 11); first degree terroristic threatening of Harris (Count 5); and abuse of Harris, a family or household member of Alston (Count 13). The jury acquitted Alston of first degree sexual assault of Deal (Counts 8 and 9) and third degree sexual assault of Deal (Count 10).[2]
Alston was sentenced to concurrent terms of imprisonment of life with the possibility of parole with a mandatory minimum term of fifteen years on Count 1;[3] twenty years with a mandatory minimum term of six years and eight months on each of Counts 2, 6, and 11; twenty years with a mandatory minimum term of three years and four months on Count 4; five years with a mandatory minimum term of one year and eight months on Count 5, and one year on Count 13.
Alston appeals from the Amended Judgment filed on March 7, 2007, in the Circuit Court of the First Circuit (circuit court). On appeal, Alston argues that the circuit court: 1) erred in refusing to dismiss all the charges against him because Plaintiff-Appellee State of Hawai`i (State) failed to preserve "potentially useful" physical evidence observed in Swann's apartment five months after the charged offenses; 2) erred in granting the State's motion to conduct a videotaped deposition of Deal, who was dying of cancer, to preserve her testimony; 3) erred in refusing to resolve defense counsel's oral motion to withdraw and substitute counsel before granting the State's motion for the videotaped deposition; 4) violated his right of confrontation by forcing defense counsel to represent him at Deal's deposition; 5) abused its discretion in denying additional motions for withdrawal and substitution of counsel made by Alston and defense counsel; 6) erred in admitting Harris's statements to a police officer, which were relayed to other officers, because they were hearsay and more prejudicial than probative; and 7) erred in admitting photographs of Swann's injuries because they were cumulative and more prejudicial than probative. Alston also argues that there was insufficient evidence to support his conviction for kidnapping Marable as a class A felony. We affirm the circuit court's Amended Judgment.

BACKGROUND
On an evening between April 30 and May 2, 2005, Swann, Deal, and Marable were at Swann's North Beretania Street apartment. All three had been drinking alcohol and smoking crack cocaine. Sometime after Swann retired to his bedroom to sleep, Alston and Alston's wife, Harris, arrived at Swann's apartment. Harris occasionally stayed at Swann's apartment and Swann allowed Harris to use his spare bedroom to store her clothing.
Harris testified that she and Alston went to the spare bedroom and fell asleep. When Harris awoke, they began arguing. Alston yelled and screamed at Harris, accusing her of "fooling around." When Harris denied being unfaithful, Alston grabbed Harris and hit her on the side of the face.
Swann testified that he awoke to the sound of Alston and Harris arguing in the next bedroom, and he told them to "quiet down." When the couple continued to argue, Swann picked up his cordless phone and told them, "I'm gonna call security." Swann testified that, before he could dial out, "[t]hat's when all hell broke loose." Alston immediately went to the kitchen, reappeared with two knives, and told Swann, "You going call the police, I'm going to kill you."
According to Swann, Alston attacked him with the knives. Swann grabbed a stand-up fan and attempted to shield himself from Alston's knife attacks. During the struggle, Swann fell over a coffee table, collapsed to the floor, and was stabbed. While Swann lay on the ground, Alston grabbed a bottle of rubbing alcohol and poured it on Swann. Alston then used a lighter and set Swann on fire.
In her videotaped deposition. Deal largely corroborated Swann's account of Alston's attack. Deal testified that after Swann picked up the phone, Alston went to the kitchen and emerged with a knife. Alston began stabbing at Swann who attempted to block the attacks with a fan. Alston told Swann, "Motherfucker, you going to call the police on me I'm going to kill you." Deal stated that Alston picked up a bottle of rubbing alcohol, poured it on Swann, and set Swann on fire.
During the commotion, Harris attempted to leave the apartment, but Alston physically prevented her from doing so. Harris testified that Alston pulled her away from the door by the hair and said, "Where the fuck you think you going .... You ain't going anywhere."
Swann eventually extinguished the flames by tearing off his t-shirt and rolling on the floor, but he was experiencing a great deal of pain and was "bleeding all over." Deal testified that Alston threatened to kill everyone if Swann died as a result of his injuries. Harris told Alston that Swann needed to go to the hospital, but Alston refused to allow Swann to leave the apartment. Instead, Swann was dragged into his bedroom where Alston and Harris, at Alston's direction, bound Swann's wrists and ankles, gagged him, then tied his legs to a clothing rod in the closet. At one point, Swann had to use the bathroom and was forced to urinate in a bucket. Swann recalled that during his confinement in his bedroom, he was going in and out of consciousness and nearly passed out due to the loss of blood.
Alston tore bed sheets into strips and instructed Harris to tie up Deal and Marable. After Harris restrained Deal and Marable in the bedroom, Alston tied up Harris's hands and legs. Alston gagged all three by placing socks in their mouths. At some point while Harris was restrained, Alston poured 151proof rum on her, told her that she was "gonna burn," and then laughed when she begged him to stop. Harris recalled Alston saying that "nobody going nowhere, nobody could leave."
In the afternoon on May 2, 2005, Harris persuaded Alston to allow her to leave the apartment in order to purchase something sweet for Marable, who was diabetic and did not have his medication. In addition to going to the store, Harris went to Aala Park to buy cocaine because she thought "it would calm down the whole situation." On her way back to the apartment, Harris saw Honolulu Police Department (HPD) Officer Roosevelt Blanco (Officer Blanco) and flagged him down. Officer Blanco testified that Harris told him that her husband had tied up some people in the apartment and had stabbed one of them. Officer Blanco told Harris to remain downstairs. Instead, Harris ran back into the apartment building because, according to Harris, she "didn't want nothing else to go wrong." Based on Harris's statements. Officer Blanco radioed for assistance, and five or six police officers responded to the scene.
A short time later, the officers went up to Swann's apartment and knocked and announced their presence. Alston opened the door, and he was placed on the floor and handcuffed. During a patdown search, an officer recovered a fold-down knife from Alston's person. The officer who transported Alston to the police station for booking did not notice any injuries on Alston.
Officer Blanco conducted a sweep of the apartment and followed a blood trail on the floor that led to the bedroom where he discovered Swann, still bound, covered with blood. Another officer observed that Swann had burn marks and that Swann's shirt was covered in what appeared to be dried blood and pus. When the officers located Deal in the bedroom, she was laying on the ground with her hands and feet bound with cord. Photographs showing Deal restrained, as well as photographs depicting the ligature marks on her wrists and ankles after the officers removed her restraints, were admitted in evidence. Marable was not bound when the police entered the apartment. An HPD evidence specialist testified that there were pools of blood in the living room and along the hallway, and that the couches and other furniture were covered with blood.
Dr. Susan Steineman, the physician who treated Swann when he was brought to the emergency room, testified that Swann suffered stab wounds to his abdomen, hand, thigh, and forearm. The deepest laceration was a stab wound to Swann's left forearm, which resulted in laceration of the muscle. Swann had first- and second-degree burns over eight percent of his body, including burns to his face (on the left side), lips, neck, upper chest and shoulder, and right hand and forearm.

DISCUSSION

I.
During a viewing of Swann's apartment five months after the charged offenses, Alston'>s counsel and defense investigators observed apparent drug paraphernalia and drugs in the apartment and notified the prosecutor's investigator who was present. Alston contends that this evidence was exculpatory, in that it could have been used to impeach Swann's credibility, and that the State acted in bad faith in failing to seize the evidence. Alston argues that the State's "destruction of or failure to preserve" this evidence of drug paraphernalia and drugs violated his due process rights and constituted prosecutorial misconduct and, therefore, the circuit court erred in denying his pretrial motion to dismiss all the charges.
We disagree. Given the evidence introduced at trial, the incremental impeachment value of the evidence of drug paraphernalia and drugs observed in Swann's apartment five months after the charged offenses would have been minimal. Thus, the alleged failure of the State to preserve this evidence did not deprive Alston of evidence material to his defense, render his trial fundamentally unfair, or affect the outcome of his case. Accordingly, the circuit court did not err in denying Alston's motion to dismiss.

A.
The factual context for Alston's motion to dismiss was as follows. Prior to trial, Alston filed a "Motion to Compel Viewing of Crime Scene," requesting that the circuit court order the State to permit the defense to view Swann's apartment. The circuit court took the motion under advisement and gave the parties the opportunity to resolve the matter. An agreement was apparently reached, and on October 7, 2005, the defense team. comprised of Alston's first court-appointed counsel, Myles Breiner, and two investigators, participated in a viewing of Swann's apartment. An investigator from the prosecutor's office, Tyson Tsukamoto, was present to monitor the defense team's viewing and to secure the apartment when the defense team was done. No one else was present in the apartment during the defense team's viewing.
One of the defense investigators videotaped the defense team's viewing of the apartment and also took photographs. Tsukamoto stated that he observed members of the defense team picking up items in the apartment, opening some mail, flipping through papers, and opening the doors of a cabinet and the refrigerator and the cover of a crock pot. Members of the defense team observed three glass pipes with residue on top of the refrigerator, steel wool with residue in and near an ashtray in a bedroom, and two apparent counterfeit $20 bills next to a telephone. Members of the defense team recognized the glass pipes and steel wool as drug paraphernalia, used to smoke drugs, and Breiner believed the residue contained drugs.
The defense team brought the suspected drug paraphernalia, drugs, and counterfeit bills to Tsukamoto's attention. Breiner asked Tsukamoto to recover these items and to inform Honolulu City Prosecutor Peter Carlisle, who was handling Alston's case, about the discovery of the items. After the defense team had completed its viewing, Tsukamoto secured the apartment without recovering the items. Tsukamoto believed that his authority to be in Swann's apartment was limited to performing a walk-through of the apartment, that the items were not in plain view, and that the items had been discovered pursuant to an illegal search and seizure. Upon returning to his office, Tsukamoto informed his boss, Chief Investigator Robert Lee, about the defense team's discovery of apparent drug paraphernalia and drugs. Lee told Tsukamoto that the items had been discovered pursuant to an illegal search. Shortly thereafter, Tsukamoto spoke to Carlisle who, according to Tsukamoto, told Tsukamoto the same thing.
On October 19, 2005, Breiner sent a letter to Carlisle noting that the defense team had observed drug paraphernalia during its viewing of Swann's apartment, and Breiner asked to be notified if any drug paraphernalia charges have been or will be filed against Swann. Carlisle forwarded Breiner's letter to HPD, along with photographs taken by the defense team of the alleged contraband. Carlisle asked HPD to "take whatever action [HPD] deems appropriate" and to confer with the Attorney General's Office if HPD concludes that criminal charges should be brought against Swann. On December 1, 2005, the Chief of HPD replied that the defense team, upon discovering the alleged drug paraphernalia, did not notify HPD to document and recover the evidence, and therefore, HPD was not able to take any further action.
On April 20, 2006, Alston filed a "Motion to Dismiss Based on the Failure to Preserve Evidence and the Destruction of Evidence." Alston contended that the State's failure to seize the drug paraphernalia and drugs observed by the defense team during its viewing of Swann's apartment resulted in such evidence being "destroyed," "forever lost," and unavailable for chemical testing. Alston argued that he suffered prejudice because: 1) evidence of the drug paraphernalia and drugs would undermine Swann's credibility by impeaching Swann's purported claim that he never did drugs; 2) the evidence would provide evidence of drug use by Swann, which in turn would be relevant to Swann's perception, memory, and credibility; and 3) the evidence would support a defense theory that the use of flammable liquids associated with drug use could explain Swann's injuries. In response, the State argued, among other things, that Alston had not demonstrated that the missing contraband was relevant to Alston's guilt or innocence or that it possessed any exculpatory value, especially given the five-month interval between the charged offenses and the viewing of Swann's apartment.
The circuit court denied Alston's motion to dismiss. The circuit court orally ruled:
With respect to the motion to dismiss, the applicable law which is cited by both counsel, which was State v. Matafeo[,] 71 Hawaii 183, the threshold question for the Court is whether the movant has established that the State failed to preserve evidence that was exculpatory or favorable to the defendant. The Court is going to find that defendant has failed to meet that burden, so therefore the motion is denied.
The circuit court also granted the State's motion in limine to preclude evidence of Swann's illegal drug use that occurred after the charged offenses, including the evidence of the suspected contraband observed in Swann's apartment on October 7, 2005. The circuit court ruled that such evidence was not relevant, but even if relevant, its prejudicial impact outweighed its probative value. The circuit count noted that its ruling on the motion in limine was preliminary and that the defense could revisit the issue based on the evidence presented at trial.
B.
The State's suppression of evidence favorable to the accused
"violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963); State v. Marzo, 64 Haw. 395, 641 P.2d 1338 (1982); State v. Kaiu, 5 Haw. App. 350, 692 P.2d 1166 (1984). Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).
State v. Moriwaki, 71 Haw. 347, 356, 791 P.2d 392, 397 (1990). Stated another way, in order to establish a due process violation for suppression of exculpatory evidence, a defendant "must make a showing that the suppressed evidence would create a reasonable doubt about the [defendant's] guilt that would not otherwise exist." State v. Okumura, 78 Hawai`i 383, 402, 894 P.2d 80, 99 (1995) (citation, internal quotation marks, and brackets omitted).
In Arizona v. Youngblood, 488 U.S. 51 (1988), the United States Supreme Court considered whether the Due Process Clause of the Fourteenth Amendment was violated by the government's failure to preserve potentially exculpatory evidence. The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58. In State v. Matafeo, 71 Haw. 183, 787 P. 2d 671 (1990), the Hawai`i Supreme Court determined that in the situation presented by Youngblood, a criminal defendant was entitled to greater protection under Hawai`i law than provided under Youngblood. The Hawai`i Supreme Court held that "[i]n certain circumstances, regardless of good or bad faith, the State may lose or destroy material evidence which is `so critical to the defense as to make a criminal trial fundamentally unfair' without it." Matafeo, 71 Haw. at 187, 787 P.2d at 673 (quoting Youngblood, 488 U.S. at 61 (Stevens, J., concurring)).

C.
For purposes of our analysis, we assume that the glass pipes and steel wool observed by the defense team in Swann's apartment were in fact drug paraphernalia and that the residue associated with these items contained a prohibited drug. Even under this assumption, we conclude that the State's failure to seize the drug paraphernalia and drugs did not deprive Alston of any material exculpatory evidence.[4]
As noted, the drug paraphernalia and drugs were seen by the defense team five months after the charged offenses. Given the time lag, this evidence was not directly relevant to whether Alston had committed the charged offenses. Indeed, on appeal, the only prejudice that Alston suggests resulted from the State's failure to seize these items is that the State's inaction prevented him from impeaching Swann's purported denial of using drugs. Alston contends that "Mr. Swann had previously denied that he used drugs during the incident or that he was a drug addict.[5]
However, at trial, Swann testified that he and his friends were smoking crack cocaine on the day of the charged incident, before the incident unfolded. Defense counsel asked Swann how he smoked his crack cocaine, and Swann replied, "[W]ith a lighter and a  and a pipe." Defense counsel asked Swann for the location of the pipe he used to smoke crack cocaine prior to the charged offenses. Swann replied that his pipe was "[p]robably laying in one of the ashtrays or something[;] I smoke, I admit that." Swann, however, was unable to specifically identify his pipe because "we was all doing it."
Given Swann's trial admissions that he smoked crack cocaine near the time of the charged incident, there was no need for the defense to introduce evidence that drug paraphernalia and drugs were found in Swann's apartment five months later. Swann's trial admissions provided ample basis for impeaching Swann's purported denial of drug use. Indeed, Swann's admissions that he smoked crack cocaine on the day of the charged incident provided a much better basis for impeaching his credibility than the non-seized evidence.
Alston was able to use Swann's trial admissions to extensively impeach Swann's credibility. Alston used Swann's trial admissions to suggest that Swann lied to the police by only telling them that he had been drinking alcohol, and not mentioning that he smoked crack cocaine, on the day of the charged incident. Alston also used Swann's trial admissions to attack Swann's ability to accurately perceive and recall the events surrounding the charged incident. Alston further elicited Swann's acknowledgment that he had been granted immunity from prosecution in exchange for his testimony.
Accordingly, the defense was able to provide the jury with ample basis for questioning Swann's credibility. Evidence of the defense team's discovery of drug paraphernalia and drugs at Swann's apartment would have been cumulative and would have provided little, if any, additional impeachment value. See Moore v. State, 1 So.3d 871 (Miss. Ct. App. 2008) (holding that exclusion of cumulative impeachment evidence was harmless). Under these circumstances, even assuming arguendo that the State's failure to preserve the drug paraphernalia and drugs observed by the defense team was improper, the State's inaction did not deprive Alston of evidence material to his defense, did not render the trial fundamentally unfair, and was harmless beyond a reasonable doubt. See Moriwaki, 71 Haw. at 356, 791 P.2d at 397; Okumura, 78 Hawai`i at 401-02, 894 P.2d at 98-99; United States v. Agurs, 427 U.S. 97, 107-14 (1976); State v. Sale, 110 Hawai`i 386, 397, 133 P.3d 815, 826 (App. 2006) (applying harmless error analysis to alleged due process violation).
For similar reasons, Alston's claim of prosecutorial misconduct does not provide him with any basis for relief. We need not decide whether the prosecution's conduct was improper because, as noted above, any error in the State's failure to seize the drug paraphernalia and drugs observed by the defense team was harmless beyond a reasonable doubt and did not contribute to Alston's convictions. See State v. Maddox, 116 Hawai`i 445, 461, 173 P.3d 592, 608 (App. 2007) (noting that prosecutorial misconduct does not warrant overturning a conviction unless it prejudices the defendant's right to a fair trial).

II.
Alston argues that the circuit court: 1) erred in granting the State's motion to conduct a videotaped deposition of Deal, who was dying of cancer, to preserve her testimony; 2) erred in refusing to resolve defense counsel's oral motion to withdraw and substitute counsel before granting the State's motion for the videotaped deposition; 3) violated his right of confrontation by forcing defense counsel to represent him at Deal's deposition; and 4) abused its discretion in denying additional motions for withdrawal and substitution of counsel made by Alston and defense counsel. We disagree.

A.
The circumstances surrounding the State's request for a videotaped deposition to preserve Deal's testimony and the various defense motions for the withdrawal and substitution of counsel are as follows.

1.
In February 2006, Myles Breiner, Alston's first court-appointed attorney, moved to withdraw as counsel. Breiner informed the circuit court that Alston felt that Breiner was not being "an effective advocate for him." Alston concurred in Breiner's motion. The circuit court informed Alston that if Breiner was removed, another court-appointed attorney would be assigned to his case, to which Alston responded, "I don't care how long this takes, how many lawyers I got to go through, I'm going to be here." The circuit court further advised Alston that his opportunities to obtain new counsel were not "unlimited." The circuit court granted Breiner's motion based on the "break down" of the attorney-client relationship, and Nelson W.S. Goo was appointed as Alston's new counsel.

2.
On March 16, 2006, the State filed a motion for an order authorizing the taking of a videotaped deposition of Deal to preserve Deal's testimony pursuant to Hawai`i Rules of Penal Procedure (HRPP) Rule 15(a).[6] In its motion, the State represented that Deal was suffering from lung cancer. No action was taken on the motion until August 9, 2006, when, at the State's request, an emergency hearing was held on the motion. At the hearing,[7] the State represented that it had been notified the previous day that Deal's health had "taken a turn for the worse [,]" that Deal was in the second stage of terminal cancer, and that she was in hospice care. The State informed the circuit court that the State was obtaining verification of Deal's condition, which the State would promptly submit to the court.
Before the circuit court ruled on the State's motion, Goo made an oral motion to withdraw as Alston's counsel and for appointment of substitute counsel. Goo provided the court with a copy of the written motion for withdrawal and substitution of counsel that Goo had recently prepared. Goo's written motion contained Goo's declaration which stated, among other things:
4. [Alston] is unwilling to speak with [Goo];
5. Although [Goo] is prepared with the case file, without communication with Declarant [sic] it is impossible to go through trial in front of a jury; [and]
. . .
7. Thus, irreconcilable differences have arisen between [Alston] and [Goo] which prevents effective representation[.]
At the hearing, Alston asserted that Goo was "not doing anything that I asked him to do" and was "doing everything against what I asked him to do as an attorney."
Over Goo's objection, the circuit court declined to rule on Goo's motion to withdraw and substitute counsel. The circuit court explained that it was temporarily sitting in for Judge Del Rosario and that given the exigency of the circumstances, the videotaped deposition must be taken in the very near future. The circuit court granted the State's motion to take a videotaped deposition of Deal and ordered Goo to represent Alston at the deposition, which was tentatively scheduled for August 12, 2006 (three days later). The circuit court asked Alston whether he wanted a video conferencing system set up to permit him to participate in the deposition, and Alston replied, "Don't waste your time." The circuit court later asked Alston if he wanted to be physically present at the deposition. Alston stated that he understood his right to be physically present but did not want to be present.
In the afternoon after the hearing, the State filed a letter from Deal's primary care physician which stated that Deal is in hospice status, meaning she was expected to die within six months, requires 24-hour oxygen use and medication for pain control, and would not be able to appear in court due to her "grim prognosis." On August 10, 2006, the State filed a letter from Deal's oncologist who stated that Deal's expected survival was less than three months. Later that day, the circuit court entered its written order granting the State's motion to take a videotaped deposition of Deal.
On August 12, 2006, Deal's videotaped deposition was taken, and Deal was questioned by the State and cross-examined by Goo. It appears that Alston was given the opportunity to view and hear the deposition on a television monitor from a video conferencing room at the prison and to contemporaneously communicate with Goo as the deposition proceeded. The State later informed the circuit court, however, that during Deal's deposition, Alston threw the television monitor to the floor and tried to remove the wires so "there wouldn't be any opportunity for him to be in communication with Mr. Goo." Alston was then taken to a cell where a monitor was set on a stool outside the cell's bars, but he threw toilet water on the monitor.

3.
On August 14, 2006, Goo filed a motion to withdraw and substitute counsel, which Goo had discussed at the August 9, 2006, hearing, alleging problems in communicating with Alston. However, at the August 23, 2006, hearing on the motion, Goo and Alston agreed to withdraw the motion. Goo informed the circuit court that since filing the motion, Goo and Alston had "some communication" and that after Deal's deposition. Goo went to see Alston and "there's more communication going on." In response to the circuit court's inquiry, Alston stated that he wanted to have Goo remain as his attorney. Goo orally moved for a two-month continuance of the trial that was set for the week of September 5, 2006. The circuit court denied the continuance motion.
On September 5, 2006, just prior to jury selection, Alston told the circuit court that he was not satisfied with Goo's representation because Goo had not adequately worked with Alston in preparing for trial. The circuit court treated Alston's statement as a request to have Goo withdraw. Goo responded that he attempted to speak with Alston on several occasions, but "when [Alston] tells me that he doesn't want to talk to me, there's not much I can do."
The circuit court denied Alston's motion for withdrawal of counsel, stating that Goo was an experienced criminal defense attorney and
with respect to his preparation and for your benefit, Mr. Alston, I've met on numerous occasions with counsel on this case regarding evidentiary matters, regarding exhibits, conference regarding defenses, and during all of those periods excuse me, Mr. Alston, while you may feel and you may have a right to feel that way that he has not adequately met with you, from the Court's perspective in the preparation of your defense, he had, in the Court's view, provided more than adequate representation. He's been a vigorous advocate for you and he has gone through many different  raised many, many different issues in your representation.
The circuit court advised Alston that he had the option of representing himself, but Alston declined that option, advising the circuit court that he wanted a different attorney. Alston stated, "Well, how am I going to represent myself? I don't know court proceedings and all that. I want a different attorney, somebody who is going to represent me in my behalf, adequate counsel."
Following a recess, the circuit court reconvened without Alston because Alston refused to leave his cell and participate in jury selection. Goo then made an oral motion to withdraw, explaining that he feared for his safety because he had just been threatened by Alston:
[Alston] made a threat against me .... [B]ecause of that threat I don't think that once he decides to sit next to me that it will be safe, and. Your Honor, it goes beyond what happens in this courtroom. I'm not sure one day what might happen, so for that reason. Your Honor, I do make my motion to withdraw.
The State argued that Alston had a history of attempting to disrupt the case and engaging in dilatory tactics. The State noted that Alston had fired Breiner, his first appointed counsel, and also referred to Alston's disruptive conduct in damaging the video conferencing equipment set up for Deal's deposition and Alston's spurning the opportunity to participate in that deposition. The State asserted that Alston was deliberately attempting to disrupt the proceedings to gain a tactical advantage. The circuit court denied Goo's motion to withdraw. The circuit court did not specifically address Goo's reason for seeking withdrawal but ruled that Alston had not provided an objectively reasonable basis for Goo's withdrawal.
Alston returned to the courtroom on the morning of the second day of jury selection, and he was present in court throughout the remainder of the trial proceedings. During the trial. Goo initially objected to the playing of Deal's videotaped deposition on the ground that the State had not established that Deal was unavailable to testify in person. However, after Goo and Alston conferred, this objection was withdrawn. Deal's redacted videotaped deposition was played for the jury.

B.

1.
Alston contends that the circuit court erred in granting the State's motion to take the videotaped deposition of Deal because the State failed to demonstrate that special circumstances or the interest of justice necessitated the deposition. Alston is wrong.
Under HRPP Rule 15(a), a court may authorize a deposition in a criminal case "[w]henever due to special circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial." The decision to authorize the deposition is a matter within the trial court's discretion. See United States v. Ramos, 45 F.3d 1519, 1522 (11th Cir. 1995) (applying abuse of discretion standard to court's decision to authorize or deny a deposition under Federal Rules of Criminal Procedure (FRCrP) Rule 15(a), which is analogous to HRPP Rule 15(a)).
The State adequately demonstrated that special circumstances and the interest of justice necessitated the preservation of Deal's testimony through a deposition.[8] Deal was suffering from terminal lung cancer and was in hospice status. Her "grim prognosis" made it unlikely that she would be available to testify or capable of testifying at Alston's trial. The State verified its oral representations regarding Deal's dire medical condition by filing letters submitted by Deal's physicians and thus provided sufficient evidence of Deal's condition. See United States v. Pes Marteau, 162 F.R.D. 364, 368 (M.D. Fla. 1995) (noting that for purposes of FRCrP Rule 15(a), representations made by counsel in open court have been held sufficient to establish unavailability).
Deal's expected testimony was essential to support the State's allegations of sexual assault charged in Counts 8, 9, and 10 because Deal was the alleged victim and only eyewitness for these counts. Deal was also the alleged victim of the kidnapping and terroristic threatening charged in Counts 11 and 12. Thus, her testimony was clearly material. Accordingly, the circuit court did not abuse its discretion in allowing Deal's deposition to be taken.[9]

2.
The circuit court did not err in granting the State's motion for the videotaped deposition of Deal without resolving Goo's motion to withdraw and substitute counsel and in ordering Goo to represent Alston at the deposition. The circuit court was placed in a difficult situation. The reports of Deal's rapidly declining health necessitated the immediate taking of her deposition and prompted the State to request an emergency hearing on its motion. In fact. Deal's deposition was taken three days after the hearing. Goo's motion to withdraw and substitute counsel was presented to the circuit court at the hearing on the State's motion. It likely would have taken a significant period of time for a newly-appointed attorney to become sufficiently familiar with Alston's case to provide adequate representation at Deal's deposition. Goo had been counsel of record for several months and was familiar with the case. Under these circumstances, the circuit court did not err in declining to rule on Goo's motion to withdraw and substitute counsel and instead ordering Goo to represent Alston at the deposition.
Moreover, the record reflects that Alston did not have good cause to replace Goo as counsel. Thus, any error in failing to rule on Goo's motion before the deposition did not affect Alston's substantial rights and was harmless.
We review a trial court's denial of a motion for withdrawal and substitution of appointed counsel for abuse of discretion. State v. Kossman, 101 Hawai`i 112, 119, 63 P.3d 420, 427 (App. 2003). The trial court's decision will be upheld unless "there [has been] an abuse of discretion that prejudiced the defendant by amounting to an unconstitutional denial of the right to effective assistance of counsel." Id. (citation and internal quotation marks omitted); see State v. Ahlo, 2 Haw. App. 462, 469, 634 P.2d 421, 426 (1981) (stating that whether to permit an indigent defendant to change counsel rests in the sound discretion of the trial court).
"There is no absolute right, constitutional or otherwise, for an indigent to have the court order a change in court-appointed counsel." Kossman, 101 Hawai`i at 119, 63 P. 3d at 427 (citation, internal quotation marks, and brackets omitted). Courts must impose restraints on the right to reassignment of counsel "lest the right be manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." Id. (quoting State v. Soares, 81 Hawai`i 332, 354, 916 P.2d 1233, 1255 (App. 1996)).
"[W]hen an indigent defendant requests that his or her appointed counsel be replaced, the trial court has a duty to conduct a `penetrating and comprehensive examination' of the defendant on the record, in order to ascertain the bases for the defendant's request." Spares, 81 Hawai`i at 355, 916 P. 2d at 1256 (quoting State v. Kane, 52 Haw. 484, 487-88, 479 P.2d 207, 209 (1971)). However, this examination is "not an end unto itself, but merely a means to an end," namely, the proper determination of whether there is good cause to warrant substitution of counsel. Kossman, 101 Hawai`i at 119-20, 63 P.3d at 427-28 (upholding the circuit court's denial of defendant's request for substitute counsel, despite the lack of a comprehensive examination, because it was clear from the record that there was no good cause for the request).
Goo's motion to withdraw and substitute counsel was based on his assertion that Alston was "unwilling" to consult with Goo and that without communication with Alston, Goo could not effectively represent Alston. Goo's motion reflects that Alston, not Goo, impeded the attorney-client relationship. Alston's unwillingness to communicate with Goo is not a sufficient reason to grant substitution of counsel. See McKee v. Harris, 649 F.2d 927, 933 (2d Cir. 1981) (indicating that a defendant cannot demand a substitution of counsel based on a breakdown in communication that the defendant himself induced) (cited in Soares, 81 Hawai`i at 355, 916 P.2d at 1256); United States v. Reyes, 352 F.3d 511, 516 (1st Cir. 2003) (noting that a defendant can not force a substitution in counsel by refusing to talk to his lawyer); People v. Meyers, 335 N.W.2d 189, 197 (Mich. App. Ct. 1983) ("A defendant may not purposely break down the attorney-client relationship by refusing to cooperate with his assigned attorney and then argue that there is good cause for a substitution of counsel.").
In addition, when the circuit court held a hearing on Goo's motion. Goo and Alston withdrew the motion. Alston specifically represented that he wanted Goo to remain as his attorney. Alston has not shown that he was entitled to have Goo replaced as appointed counsel before Deal's deposition. Alston also does not allege that Goo's representation at the deposition was in any way deficient.[10] Thus, Alston has not shown any prejudice from the circuit court's failure to resolve Goo's motion to withdraw or to conduct a more searching inquiry on the motion before the deposition. See Kossman, 101 Hawai`i at 119-21, 63 P.3d at 427-29; United States v. John Doe No. 1, 272 F.3d 116, 123 (2d Cir. 2001) (noting that "if the reasons proffered [for a motion to substitute counsel] are insubstantial and the defendant receives competent representation from counsel, a court's failure to inquire sufficiently or to inquire at all constitutes harmless error"); McKee, 649 F.2d at 933 (noting that where the court's failure to inquire into the reasons for the defendant's dissatisfaction with counsel causes the defendant no harm, that procedural irregularity constitutes harmless error).
Based on the foregoing analysis, we also reject Alston's claim that the circuit court violated his right of confrontation by requiring Goo to represent Alston at Deal's deposition.

3.
We conclude that the circuit court properly exercised its discretion in denying Alston's and Goo's motions for withdrawal and substitution of counsel, which were made on the first day of jury selection. The circuit court inquired into Alston's reasons for his claimed dissatisfaction with Goo and gave Alston ample opportunity to articulate his reasons. The circuit court reasonably concluded that Alston was not entitled to the appointment of new counsel. See Kossman, 101 Hawai`i at 119, 63 P.3d at 427. As previously noted, a defendant is not entitled to substitution of counsel where the defendant's own conduct substantially caused the breakdown in communication. The record supports the conclusion that any deterioration in the attorney-client relationship was largely, if not entirely, the result of Alston's disruptive behavior and unwillingness to communicate or cooperate with Goo. See id. at 120, 63 P.3d at 428; John Doe No. 1, 272 F.3d at 124-25; Reyes, 352 F.3d at 516. Accordingly, Alston failed to demonstrate good cause for the substitution of counsel.
The circuit court did not abuse its discretion in refusing to appoint new counsel when, immediately following the denial of Alston's motion for withdrawal and substitution of counsel, Alston verbally threatened Goo, which prompted Goo's motion to withdraw. See People v. Staffney, 468 N.W.2d 238, 241 (Mich. Ct. App. 1990) (concluding that a defendant may not assault appointed counsel and then use that as the basis for obtaining substitute counsel); John Doe No. 1, 272 F.3d at 124-25 (upholding trial court's denial of motion to substitute counsel where defendant threatened defense counsel and defense counsel's family); People v. Linares, 813 N.E.2d 609, 612 (N.Y. 2004) (upholding denial of motion to substitute counsel where defendant had threatened counsel with violence because "[s]ubstitution of counsel is an instrument designed to remedy meaningful impairments to effective representation, not to reward truculence with delay"). Alston's eleventh-hour threat was a transparent attempt to manipulate the right to counsel in order to force the substitution of counsel and delay the trial. See John Doe No. 1, 272 F.3d at 126 ("[D]efining conduct of a threatening or violent nature [by defendants against their counsel] as creating an actual conflict of interest would potentially encourage defendants to take such action in the hopes of having an avenue to later seek reversal of a conviction."); United States v. Corporan-Cuevas, 35 F.3d 953, 956 (4th Cir. 1994) (noting that a motion for substitution of counsel made on the first day of trial "would clearly be untimely under all but the most exigent circumstances"). The circuit court reasonably held that Alston's unjustified antagonism toward Goo did not warrant the withdrawal and substitution of counsel."[11]

III.
Alston asserts that the circuit court erred in allowing Officer Blanco and other officers to testify about what Harris told Officer Blanco when she flagged him down. The circuit court ruled that such testimony was admissible for the non-hearsay purpose of explaining the officers' actions. Alston contends that the testimony of Officer Blanco and the other officers constituted inadmissible hearsay and that its probative value was substantially outweighed by the danger of unfair prejudice. We do not address whether the circuit court erred in admitting this testimony because we conclude that any error did not affect Alston's substantial rights.

A.
At trial, Officer Blanco testified that on May 2, 2005, while he was on foot patrol in the Chinatown area, he observed a woman waving and trying to flag him down. When the State asked Officer Blanco what the woman said to him, defense counsel objected on the ground of hearsay. The circuit court overruled the objection and instructed the jury as follows:
Ladies and gentlemen, the witness is going to testify what was told him by an individual. This evidence is admitted for the limited purpose of showing what the police did after they received this evidence. It's not received in order to prove the truth of the matter stated. In other words, you are not to accept that statement the facts of that statement as true; rather, it will attest that statement was made to this officer and as a result of that statement, the police took certain actions.
Thereafter, Officer Blanco testified that the woman, subsequently identified as Harris, told him
that her husband was going to kill her if he finds out that she was talking to me, a police officer. She told me she was tied up by her husband and he threatened to kill her, and she also  the husband also tied up three other people in [the apartment] and the husband stabbed one of the three guys up there.
Officer Blanco further testified that he heard from Harris that there were people tied up, that a knife was involved and someone had been stabbed, that Harris was afraid for herself and the others, and that her husband's name was William Alston.
Officer Blanco stated that based upon the information provided by Harris, he radioed for backup. Five or six other officers responded, including three officers, Lyle Wakabayashi, Anthony Nguyen, and Winston Leong, who testified for the State at Alston's trial.
The three officers were permitted to testify about the information that Harris had related to Officer Blanco. In each instance, the circuit court overruled Alston's hearsay objection and gave a limiting instruction which advised the jury that the officer's testimony was being admitted for the non-hearsay purpose of explaining the officers' actions. Officer Wakabayashi testified that he received information that three people were tied up and held against their will in an apartment building and that one was possibly stabbed. Officer Nguyen testified that Officer Blanco "related that a female approached him and stated that there was some sort of a kidnapping" and that Officer Nguyen "heard that a female and approximately three other people were upstairs, tied up, and that one of them had been stabbed." Officer Leong testified that he was informed by Officer Blanco that there was "a possible kidnapping type case" and that a female had flagged Officer Blanco down and "told [Officer Blanco] that her husband had three people tied up against their will in [a specified apartment unit] and he already stabbed one of them already." The officers testified that based on the information relayed to them, they decided to make immediate entry into the apartment.
Harris testified that she told Officer Blanco that "[t]here was a man upstairs who needed an ambulance, he needed help and he's bleeding bad. And he asked me who was in the house and I told him who. ... I told him `my husband.'"

B.
In State v. Feliciano, 2 Haw. App. 633, 636, 638 P.2d 866, 869 (1982), this court held that statements made by a non-testifying declarant to a law enforcement officer may be admitted as non-hearsay if offered "to explain an officer's conduct during the investigation procedures leading up to the arrest of the defendant, but not for their truth." See also United States v. Caver, 470 F.3d 220, 239 (6th Cir. 2006) ("Background information that explains how law enforcement came to be involved with a particular defendant is not hearsay, because it is not being offered for the truth of the matter asserted.").
We do not read Feliciano, however, as giving the prosecution carte blanche authority to introduce statements made to police officers that would otherwise be hearsay simply because the statements could serve to explain the officers' conduct. Even if such statements are offered for a non-hearsay purpose, their admissibility is subject to the probative-prejudice analysis under Hawaii Rules of Evidence (HRE) Rule 403 (1993).[12] In this analysis, the trial court should consider various factors, including how necessary or relevant an explanation of the officers' conduct is to the case; whether the officers' conduct or motives have been challenged; the potential unfair prejudice arising from the content of the statements made to the officers; and whether alternative means of explaining the officers' conduct are available.
We need not decide whether the circuit court erred in admitting the challenged testimony of Officer Blanco and the other officers. Under the circumstances of this case, we conclude that any error was harmless beyond a reasonable doubt.
First, the circuit court gave the jury limiting instructions which advised the jury that the officers' testimony regarding what Harris had said was not offered for the truth of the matter asserted, but only to explain the officers' conduct. We presume the jury followed the court's instructions. State v. Konohia, 106 Hawai`i 517, 528, 107 P.3d 1190, 1201 (App. 2005). Thus, Harris's statements to Officer Blanco were not presented to or considered by the jury as substantive evidence of Alston's commission of the charged offenses.
Second, Harris testified as a witness at trial. Accordingly, the defense had the opportunity to cross-examine Harris about the statements she made to Officer Blanco.
Third, the State introduced compelling independent evidence to prove the substance of what Harris had told Officer Blanco. The officers' testimony reflected that Harris had told Officer Blanco that Alston had tied up people in the apartment, stabbed one of them, and threatened Harris. Among other things, the State introduced evidence that when the police entered the apartment, they found Swann and Deal still bound and that Swann had sustained numerous stab wounds. In addition, Swann, Harris, and Deal all testified that people in the apartment had been tied up by Alston or at his direction and that Alston had made threats against them. The officers' testimony regarding what Harris had told Officer Blanco was therefore cumulative of other evidence presented at trial. See State v. Clark, 83 Hawai`i 289, 298, 926 P.2d 194, 203 (1996) (holding that any error in admitting a witness's testimony was harmless where it was merely cumulative of other admissible testimony presented to the jury); State v. Crisostomo, 94 Hawai`i 282, 290, 12 P.3d 873, 881 (2000) (any error in admitting alleged hearsay statements was harmless because they were merely cumulative of other admissible testimony).
For these reasons, any error in admitting the officers' testimony was harmless beyond a reasonable doubt and did not affect Alston's substantial rights.[13]

IV.
Alston argues that the circuit court erred by admitting in evidence photographs of Swann's injuries because they were cumulative and the prejudicial effect of the photographs substantially outweighed their probative value. We disagree.
Nine of the photographs were taken in the hospital shortly after the alleged attack and one was taken several days later. The photographs documented the nature and extent of Swann's injuries and thus were directly relevant to the attempted murder charge. They served to corroborated Swann's testimony that Alston intentionally stabbed Swann and set Swann on fire, and they provided a basis for the jury to infer that Alston acted with the intent to kill Swann. See State v. Ah Choy, 70 Haw. 618, 624, 780 P.2d 1097, 1101-02 (1989) (noting that intent to kill can be inferred from the nature and location of a wound and the weapon used). The photographs were also used to assist Dr. Steineman in explaining Swann's injuries to the jury. The probative value of the photographs was heightened by Alston's defense that Swann's injuries were accidental and not sufficiently serious to warrant the attempted murder charge.
Alston does not dispute that the photographs fairly and accurately depict the injuries Swann sustained. We cannot say that the photographs are so gruesome that they had the effect of overwhelming the jury's ability to reason and fairly decide the case. State v. Uyesugi, 100 Hawai`i 442, 463, 60 P.3d 843, 864 (2002); see Ahlo, 2 Haw. App. at 467, 634 P.2d at 425 (upholding admissibility of photographs of murdered victim's decomposed body including display of his skull). We conclude that the probative value of the photographs was not substantially outweighed by the danger of unfair prejudice.
The circuit court did not err in overruling Alston's objection that the photographs were cumulative. The photographs were not cumulative because they show different injuries suffered by Swann and were shot from varying distances and perspectives. See State v. Edwards, 81 Hawai`i 293, 299-300, 916 P.2d 703, 709-10 (1996). The circuit court did not abuse its discretion in admitting the photographs. Id. at 297, 916 P.2d at 707 ("The admission or rejection of photographs is a matter within the discretion of the trial court[.]").

V.
Alston contends that his conviction for kidnapping Marable should be reduced from a class A felony to a class B felony because the State failed to prove that he did not release Marable in a safe place. We disagree.
Kidnapping is a class A felony unless "the defendant voluntarily released the victim, alive and not suffering from serious or substantial bodily injury, in a safe place prior to trial." HRS § 707-720(3) (1993). The defense set forth in HRS § 707-720 (3) reduces the kidnapping offense to a class B felony. When raised, the HRS § 707-720 (3) defense requires the prosecution to prove beyond a reasonable doubt "that [the defendant] did not (a) release [the complainant] alive, (b) prior to trial, (c) voluntarily, (d) not suffering from serious or substantial bodily injury, or (e) in a safe place." State v. Mara, 102 Hawai`i 346, 356, 76 P.3d 589, 599 (App. 2003). "If and when the State satisfied its burden of disproving one or more of these five elements, it disproved the defense." Id.
The State produced sufficient evidence to support the jury's finding that Marable was not released in a safe place. When viewed in the light most favorable to the prosecution. State v. Ugalino, 107 Hawai`i 144, 158, 111 P.3d 39, 53 (App. 2005), the evidence showed that after Swann said he was calling security, Alston threatened to kill Swann, then stabbed Swann and set Swann on fire. When Harris attempted to leave the apartment during the commotion, Alston grabbed Harris by the hair and told her that she was not going anywhere. Despite Swann's significant injuries, Alston refused to permit Swann to leave the apartment to seek medical attention and threatened to kill everyone if Swann died. Alston then restrained everyone in the apartment, including Marable, by having them tied up. Alston said that no one could leave.
Given these circumstances, the fact that Alston eventually untied Marable and permitted Marable to move about the apartment does not demonstrate that Marable was released in a safe place. Marable did not leave the apartment and was present when the police made their entry. The jury could reasonably infer that despite being untied, Marable continued to be restrained by Alston's violent reactions to Swann's attempt to call security and Harris's attempt to leave the apartment and by Alston's declaration that no one could leave. The original threat of harm against anyone who attempted to leave that had been communicated by Alston continued to exist after Marable was untied. In addition, the jury could also infer that since Alston was still present and Swann and Deal remained tied up, the apartment was not a safe place. Accordingly, there was substantial evidence to show that Alston did not "release" Marable "in a safe place." See Mara, 102 Hawai`i at 356-57, 76 P.3d at 599-600; see also Carreon v. State, 63 S.W.3d 37, 39-40 (Tex. Ct. App. 2001) (construing "voluntary release in a safe place" to require that the release "must occur in a place and manner which realistically conveys to the victim that he/she is now freed from captivity and is now in circumstances and surroundings wherein aid is readily available" (citation and internal quotation marks omitted)).

CONCLUSION
We affirm the March 7, 2007, Amended Judgment of the circuit court.
NOTES
[1] The Honorable Dexter D. Del Rosario presided over Alston's trial.
[2] During trial, the Circuit Court of the First Circuit (circuit court) granted the motion of Plaintiff-Appellee State of Hawai`i (State) to nolle prosequi Counts 3, 7, and 12, which charged Alston with first degree terroristic threatening of Swann, Marable, and Deal, respectively.
[3] Alston was sentenced on Count 1 in accordance with Hawaii Revised Statutes (HRS) § 706-660.2 (1993) based on the jury's finding that in the course of attempting to commit second degree murder, Alston inflicted serious or substantial bodily injury upon Swann, who was sixty years of age or older, and Alston knew or reasonably should have known that Swann was sixty years of age or older.
[4] Under our analysis, we need not decide the propriety of the State's conduct in declining to seize these items at the defense team's request. We simply note that prosecutors are generally afforded broad discretion in deciding whom to prosecute and investigate. See State v. Dias, 100 Hawai`i 210, 227, 58 P.3d 1257, 1274 (2002) (noting that "the decision to prosecute an individual for a particular offense is left to the discretion of the prosecutor"); Wayte v. United States, 470 U.S. 598, 607-08 (1985); People v. District Court, 632 P.2d 1022, 1024 (Colo. 1981). Alston did not cite any authority for the proposition that a prosecutor is required to investigate or pursue charges against a witness at the behest of the defense.
[5] Alston cites the statements of his own counsel as support for this contention. The State argues that Alston's contention is wrong. The State claims that there is no evidence that Swann "had previously denied that he used drugs during the incident or that he was a drug addict," and that Alston's contention is a mischaracterization of what Swann told the police. Swann testified that while being interviewed by the police at the hospital after the charged incident, he told detectives that he had been drinking vodka and beer on the day of the incident. Swann stated that he did not tell the police that he had been using drugs because "[n]obody asked me" and because he did not want to get himself or anyone else in trouble.
[6] HRPP Rule 15(a) provides in relevant part:

(a) When Taken. Whenever due to special circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place.
[7] Both parties agree that the hearing transcript erroneously identifies Judge Dexter D. Del Rosario as presiding over the hearing. The parties agree that the Honorable Derrick H.M. Chan presided over the emergency hearing as a substitute for Judge Del Rosario, who was the trial judge assigned to the case.
[8] HRPP Rule 15(a) does not specify what constitute "special circumstances." The analogous FRCrP Rule 15(a) permits a court to authorize a deposition "because of exceptional circumstances and in the interests of justice." Federal courts have considered whether the witness will be unavailable to testify at trial and the materiality of the witness's testimony in determining whether exceptional circumstances exist under FRCrP Rule 15(a). See United States v. Liner, 435 F.3d 920, 924 (8th Cir. 2006); United States v. Drogoul, 1 F.3d 1546, 1552 (11th Cir. 1993).
[9] We reject Alston's claim that the State's delay in pursuing the motion for Deal's deposition after its initial filing indicates that taking the deposition was not justified by special circumstances or the interest of justice. Regardless of whether there was a valid basis for the deposition when the State filed its motion in March 2006, Deal's deteriorating medical condition justified taking the deposition when the circuit court granted the motion in August 2006.
[10] Indeed, Goo's representation of Alston at Deal's deposition appears to have been effective in the sense that of the five counts in the indictment for which Deal was the complaining witness, Alston was only convicted of one count, the kidnapping count, which was supported by testimony of other witnesses. Alston was acquitted of the three sex assault counts, and the terroristic threatening count was dismissed during trial on the State's nolle prosequi motion.
[11] The State asserts that after Alston returned to the courtroom for the second day of jury selection, "no issues of communication, ineffectiveness [of counsel] or conflict" were raised by the defense during the remainder of the trial. The record indicates that Alston and Goo consulted with each other during the trial, and Alston does not argue that his verbal threat against Goo affected Goo's trial performance.
[12] HRE Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
[13] We note that in this case, the sole ground for objection raised by Alston was hearsay. However, as the circuit court's limiting instructions made clear, Harris's statements to Officer Blanco, which were also conveyed to the other officers, were not hearsay because they were not offered in evidence to prove the truth of the matter asserted. HRE Rule 801 (Supp. 2008). Thus, the circuit court did not err in overruling Alston's hearsay objection. Alston acknowledges that he did not object to the officers' testimony on HRE Rule 403 grounds. As a general rule, objecting on a specific ground waives all other grounds for objection. State v. Vliet, 91 Hawai`i 288, 299, 983 P.2d 189, 200 (1999). Even if Alston's HRE Rule 403 objection was not waived, for the reasons previously stated, we conclude that any error in admitting the challenged testimony did not affect Alston's substantial rights.